Leonard B. **PANTHER**, Appellant,

v.

**STATE of Alaska, Appellee.**

No. A–2631.

Court of Appeals of Alaska.

Sept. 22, 1989.

Rehearing Denied Oct. 17, 1989.

---

Robert Merle Cowan, Kenai, and Walter Share, Anchorage, for appellant.

Robert D. Bacon, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Leonard B. Panther was indicted for manslaughter. Following a jury trial, he was acquitted of the charge. but convicted of the lesser-included offense of criminally negligent homicide. On appeal, Panther argues that insufficient evidence was presented before the grand jury and at trial, that the criminally negligent homicide statute is unconstitutionally vague, that the state presented improper evidence to the grand jury, and that the trial court erred in instructing the jury on proximate cause. We affirm.

At about 8:30 a.m. on July 25, 1987, Leonard Panther was driving his Volkswagen south on Homer Spit Road when he collided headon with a GMC Blazer driven by Michael Wickline. The collision seriously injured Panther and fatally injured his wife, Debra, a passenger in the Volkswagen. Wickline sustained less serious injuries.

Following an investigation, Panther was charged with manslaughter for recklessly killing his wife. The state's evidence, both before the grand jury and at trial, established that Panther's car steered out of its lane of traffic, traveling all the way across the opposite lane, over the fogline, and onto the shoulder on the far side of the road. Wickline, traveling north on Homer Spit Road in his own lane of traffic, saw

Panther approaching around a gradual curve. As Panther's car crossed the centerline, Wickline began to slow down gradually and pulled to the right, over the fogline, to the shoulder of the road and against the guardrail. Wickline assumed that the driver of the oncoming Volkswagen would see his Blazer and correct in time to avoid an accident. When Wickline realized that the Volkswagen was not going to steer out of its collision course, he locked his brakes, sending the Blazer into a skid.

The two cars collided head-on. At the point of impact, both cars were on the shoulder of the northbound lane (Wickline's lane of traffic), near the guardrail. Wickline's Blazer left skid marks approximately seventy-two feet in length. No trace of skid marks was found for Panther's Volkswagen.

Based on an examination of the accident scene and of the two cars, an accident reconstruction expert concluded that Panther's Volkswagen was traveling approximately forty miles per hour at the time of impact. The posted speed limit was forty-five miles per hour. Wickline's Blazer was traveling at about eighteen miles per hour. In the expert's opinion, approximately one and one-half seconds had elapsed from the point at which Wickline locked his brakes to the point of impact. The position of the two cars after impact indicated that Wickline's Blazer had rotated slightly toward the centerline as it skidded. The expert also concluded that, at the last moment, Panther's Volkswagen began to turn in the same direction. Apart from this slight, last-moment turn, Panther took no evasive action. The expert found no evidence to indicate that Panther had applied his brakes or otherwise attempted to slow down to any appreciable extent.

Investigation of the collision failed to disclose any specific explanation for Panther's presence on the wrong side of the road. The accident occurred on a clear, sunny morning, on an open stretch of road with good visibility. There was no other traffic on the roadway that could have interfered with either of the two cars involved in the collision. An examination of Panther's car failed to disclose any type of mechanical problem or defect. Although the collision occurred shortly after Panther's car had rounded a gradual curve in the roadway, the location of the collision was inconsistent with Panther's having simply driven straight, through the curve, without turning. The state's accident reconstruction expert concluded that, "in order to get where that Volkswagen got, it [took] a conscious steering effort to the left to wind up where it did at the point of impact, that far over in the lane."

Panther's blood was tested after the collision and found to be free of alcohol. Several weeks after the collision Panther was interviewed by a Homer police officer. Panther acknowledged seeing Wickline's Blazer but said that it was in his own (Panther's) lane of traffic when he saw it. Panther claimed that he pulled his Volkswagen to the left, into the oncoming lane to avoid the Blazer, downshifting the Volkswagen and possibly braking in order to slow down. According to Panther, the Blazer then suddenly veered back into its own lane of traffic, directly into the path of Panther's car. Panther said that although his Volkswagen crossed into Wickline's lane of traffic, it never crossed over the fogline onto the shoulder of the oncoming lane.

Panther insisted that he had not been distracted by anything before the collision, and he denied being impaired or adversely influenced by alcohol or drugs. He further stated that as far as he knew, no mechanical problems had contributed to the collision.

Although Panther did not testify before the grand jury or at trial, his statement to the police was admitted in both proceedings. Panther's version of the collision was contradicted by the physical evidence at the scene of the collision, by Wickline's testimony and the testimony of another motorist who was directly behind Wickline at the time of the collision, and by the state's accident reconstruction expert.

On appeal, Panther contends that the state's evidence, both before the grand jury

and at trial, was insufficient. In ruling on this contention, we must view the evidence in the light most favorable to the state. The evidence presented to the grand jury is sufficient when, if unexplained or uncontradicted, it would warrant a conviction. Alaska R.Crim.P. 6(q); *Lupro v. State*, 603 P.2d 468, 473 (Alaska 1979). The evidence at trial is sufficient if "fair minded persons could reasonably differ on whether guilt has been established beyond a reasonable doubt." *Adams v. State*, 598 P.2d 503, 509 n. 8 (Alaska 1979). When the evidence before the grand jury and at trial is considered in the light most favorable to the state, it is sufficient to support Panther's indictment for manslaughter and conviction for negligent homicide.

Panther was charged with manslaughter under AS 11.41.120(a)(1)[1] and was convicted of criminally negligent homicide under AS 11.41.130(a).[2] Under these statutes, manslaughter occurs when a person recklessly causes the death of another person; criminally negligent homicide occurs when a person causes the death of another person through criminal negligence.

Recklessness and criminal negligence are defined in AS 11.81.900(a)(3) and (4).[3] Under the statutory definitions, recklessness and criminal negligence both require conduct that, with respect to a specified result or circumstance, creates "a substantial and unjustifiable risk that the result will occur or that the circumstance exists...." In the case of manslaughter and criminally

negligent homicide, the statutorily specified result is the death of another person.

■ The sole distinction between recklessness and criminal negligence—and, by extension, between manslaughter and criminally negligent homicide—lies in the accused's awareness of the risk that is caused by the accused's conduct. When the accused is "aware of and consciously disregards" a substantial and unjustifiable risk that death will occur, the resulting death is manslaughter. AS 11.41.120(a)(1); AS 11.81.900(a)(3). When the accused merely "fails to perceive" the same risk, then the resulting death is criminally negligent homicide. AS 11.41.130(a); AS 11.81.-900(a)(4). *See generally Edgmon v. State*, 702 P.2d 643, 645 (Alaska App.1985).

For purposes of both offenses, "a substantial and unjustifiable risk" is a risk "of such a nature and degree that disregard of it [or failure to perceive it] constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." AS 11.81.900(a)(3) and (4).

■ In the present case, the state's evidence established that Panther, while driving his Volkswagen, was involved in a collision that resulted in his wife's death. Although the evidence did not pinpoint the exact cause of the collision, it did rule out virtually every conceivable explanation consistent with non-negligence on Panther's part. Added to the physical evidence concerning the circumstances surrounding the

1. AS 11.41.120(a)(1) provides as follows:
   (a) A person commits the crime of manslaughter if the person
   (1) intentionally, knowingly, or recklessly causes the death of another person under circumstances not amounting to murder in the first or second degree.

2. AS 11.41.130(a) provides as follows:
   (a) A person commits the crime of criminally negligent homicide if, with criminal negligence, the person causes the death of another person.

3. AS 11.81.900(a)(3) and (4) provide:
   (3) a person acts "recklessly" with respect to a result or to a circumstance described by a provision of law defining an offense when the person is aware of and consciously disregards a substantial and unjustifiable risk that the

result will occur or that the circumstance exists; the risk must be of such a nature and degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation; a person who is unaware of a risk of which the person would have been aware had that person not been intoxicated acts recklessly with respect to that risk;
   (4) a person acts with "criminal negligence" with respect to a result or to a circumstance described by a provision of law defining an offense when the person fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists; the risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

fatal collision, Panther's own statement confirmed that no mechanical failure or other external problem contributed to it.

Moreover, the evidence established that Panther drove his car completely across the opposing lane of traffic and onto the shoulder on the far side of the highway. There he collided with Wickline without any apparent attempt to apply his brakes and without any appreciable effort to take evasive action. These circumstances could certainly have justified reasonable persons in concluding that the risk posed by Panther's conduct transcended ordinary civil negligence, amounting to "a gross deviation from the standard of care [or conduct] that a reasonable person would observe in the situation." AS 11.81.900(a)(3) and (4). There was thus a sufficient basis to support the conclusion that Panther was criminally negligent.

Finally, in his own account of the accident, Panther acknowledged his awareness of Wickline's approaching vehicle. This admission could properly be considered by the grand jury and the trial jury alike and, in conjunction with the other evidence, could support the conclusion that Panther was aware of and consciously disregarded the risk posed by his driving. Moreover, jurors could properly consider Panther's demonstrably false exculpatory statement as evidence of consciousness of wrongdoing on his part. These factors could have justified a finding of recklessness, as opposed to criminal negligence.

Viewing the evidence in the light most favorable to the state, we conclude that the superior court did not err in failing to dismiss the indictment or to grant a judgment of acquittal based on insufficient evidence.

■ Panther next argues that the statutes governing manslaughter and criminally negligent homicide are unconstitutionally vague and overbroad. *See, e.g., Summers v. Anchorage*, 589 P.2d 863, 866–67 (Alaska 1979). Panther points out that ordinary civil negligence occurs when a person's conduct deviates from the standard of conduct that a reasonable person would observe in a given situation. For purposes of criminal liability, AS 11.81.900(a)(3) and

(4) define recklessness and criminal negligence as a "gross deviation" from the same standard. According to Panther, by basing the distinction between ordinary negligence and criminal negligence on the difference between a "deviation" and a "gross deviation" from the standard of care that a reasonable person would observe in a given situation, Alaska's legislature has created a wholly subjective standard that fails to provide adequate notice as to what conduct is prohibited.

The basic rule governing Panther's claim of vagueness is well settled:

> [A] statute which either forbids or requires the doing of an act in terms so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.

*Conally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). *See also State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 531 (Alaska 1980).

Applying this rule, we have previously upheld the statutory definitions of recklessness and criminal negligence against claims of vagueness. *See, e.g., Edgmon v. State*, 702 P.2d at 644–45 n. 1; *Andrew v. State*, 653 P.2d 1063, 1065 (Alaska App.1982). Panther's argument, however, is slightly different than the arguments we have previously considered.

The distinction between a "deviation," on the one hand, and a "gross deviation," on the other, undeniably involves a normative component. Yet, this imprecision is unavoidable and falls well within traditionally accepted limits. Alaska's standard of criminal negligence is taken from Model Penal Code § 2.02, which premises liability for criminal negligence on the theory that, at some point, failure to perceive a risk is "serious enough to be condemned." The Model Penal Code candidly acknowledges the difficulty of articulating a precise standard for making this determination:

> [T]he acceptability of a risk in a given case depends on a great many variables. Some standard is needed for determining

*how* substantial and *how* unjustifiable the risk must be in order to warrant a finding of culpability. There is no way to state this value judgment that does not beg the question in the last analysis; the point is that the jury must evaluate the actor's conduct and determine whether it should be condemned. The code proposes, therefore, that this difficulty be accepted frankly, and that the jury be asked to measure the substantiality and unjustifiability of the risk by asking whether its disregard, given the actor's perceptions, involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.

*Model Penal Code* Part 1, Art. 2 § 2.02 at 237 (1985).

The fact that the standard does not provide a bright-line test for determining when a risk is so substantial and unjustifiable that failure to observe it should be punished does not mean that the standard is unconstitutionally vague. Although difficult to define concretely, the statutory requirement of a "gross deviation" from the standard of care that a reasonable person would observe is readily comprehensible. *See Coates v. Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971) (suggesting that a statute requiring persons to conform their conduct to an imprecise but comprehensible normative standard is not vague).

Panther complains that he had no way of knowing what the jury would consider a gross deviation from the standard of reasonable care. Yet, as Justice Holmes observed:

> [T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree.... 'An act causing death may be murder, manslaughter, or misadventure according to the degree of danger attending it'

by common experience in the circumstances known to the actor.

*Nash v. United States*, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232 (1913). *See also Walker v. Superior Court*, 47 Cal.3d 112, 253 Cal.Rptr. 1, 763 P.2d 852, 871–73 (1988); *State v. Crocker*, 435 A.2d 58, 67 & n. 7 (Me.1981).

We conclude that the statutory definitions of recklessness and criminal negligence are not unconstitutionally vague.[4]

■ Panther additionally contends that his indictment should have been dismissed because inadmissible evidence was presented to the grand jury. Panther targets three specific points of alleged impropriety: the first involves evidence that an autopsy performed on Debra Panther disclosed that she had traces of cocaine and marijuana in her blood. The second deals with evidence suggesting that Panther's attorney refused to release Panther's hospital records to the police. The third relates to evidence of prior bad acts by Panther, including evidence indicating that the police had previously received complaints of domestic violence between Panther and his wife and evidence indicating that Panther and his wife had spent part of the evening prior to the collision in the Porpoise Room, a Homer bar.

During the grand jury hearing, Homer Police Sergeant Eastham, in response to a juror's question, stated that a test of Panther's blood performed at the hospital in Homer after the collision revealed no trace of alcohol. Eastham said that the hospital did not test Panther's blood for drugs. Eastham further testified that Panther was evacuated to a hospital in Anchorage about an hour after the collision. Eastham then told the grand jury that he did not know what tests were performed in Anchorage, because he had not been able to secure the Anchorage hospital records. According to Eastham, Panther's Anchorage attorney had initially agreed to release the records

---

**4.** In connection with his vagueness claim, Panther asserts that the trial court's instruction on criminal negligence was inadequate and potentially misleading. The challenged instruction, however, was specifically approved in *O'Leary*

*v. State*, 604 P.2d 1099, 1104 (Alaska 1979), *overruled on other grounds, Evans v. State*, 645 P.2d 155, 160 n. 11 (Alaska 1982). We find no basis for Panther's claim that it tended to confuse criminal and civil negligence.

but subsequently refused. Eastham explained that the attorney said that he represented Panther for civil purposes only and did not have authority to release the records to the police.

A grand juror asked Eastham a follow-up question about the negative blood alcohol test that was performed in Homer. The question prompted the prosecutor to ask Eastham if Debra Panther's blood had been tested. Eastham said that it had, and that the test had revealed traces of cocaine and marijuana.

A grand juror then asked Eastham if there had been "domestic problems" between Mr. and Mrs. Panther. Eastham replied that, according to his records, the police had responded three times to the Panther residence to break up fights. In response to further questioning by a grand juror about the Panthers' whereabouts before the collision, Eastham testified that the Panthers had been in the Porpoise Room, a bar in Homer where Debra Panther worked, until 9 or 10 o'clock on the night before the collision.

The questioning then returned to Debra Panther's drug use. That led a grand juror to ask if there was any way to get Panther's blood tests from Anchorage. Eastham replied that he did not know if any tests had been performed there. He told the grand jury that he lacked probable cause to apply for a search warrant to find out. A grand juror asked, "Because he [Panther] would not sign a records release for you to look at the records?" Eastham repeated that he had been in contact only with Panther's civil lawyer, who took the position that he did not have the authority to release the records. Eastham told the grand jury that Panther was outside of Alaska at the time, that his civil attorney had refused to try to call him, and that Eastham himself had not been able to contact Panther since learning that Panther's attorney would not release the hospital records without Panther's personal authorization.

Later, after Eastham had concluded his testimony and the grand jury was about to begin its deliberations, members of the grand jury asked the prosecutor how the case against Panther would be affected if it could be shown that he was intoxicated. The prosecutor responded that "there is, as far as I know, no evidence of alcohol...." However, the prosecutor continued by saying, "but if you—if the evidence had showed that the alcohol had been consumed, you could consider that also part of the negligence, to consume a substance and operate a motor vehicle, yes."

A juror then asked whether the grand jury would be informed if Panther's hospital records from Anchorage were later obtained by the prosecution. The prosecutor answered that no further information would be given to the grand jury if it acted on the proposed indictment but that the grand jury could subpoena the hospital records before acting on the case if it desired to do so:

As far as the Grand Jury is concerned, it's unlikely that you would see the case again. If you wanted to continue the matter and try and subpoena those records, for example, from the Anchorage hospital, that is something that you could do. A Grand Jury Subpoena could issue for those records if you felt that would help you in your deliberation.

The prosecutor emphasized that it was up to the grand jury to decide whether to subpoena the hospital records but that, as matters currently stood, no evidence had been presented to indicate that Panther had consumed alcohol or drugs:

You could consider that evidence in deciding, if there was no drugs or alcohol—and I think, like I say, it's your recollection of the evidence that controls, but I think the testimony by Sgt. Eastham was that the Homer hospital did look for alcohol and it was negative for alcohol. He does not know whether the Anchorage hospital did any blood or alcohol—I mean alcohol or drug tests, so he simply doesn't have any information on that, but he did tell you that the Homer hospital checked for alcohol and it was negative, as I recall, but it's your recollection that controls. But that is an option, if you folks on your own, when I'm

not here, decide that's what you wish to do, that is a power that the grand jury has, to issue a subpoena for something.

When a grand juror again asked whether drug or alcohol consumption by Panther would have a bearing on his case, the prosecutor instructed the juror that drug use by Panther could affect the case only if the evidence showed that the drug use influenced his driving and caused him to be negligent or reckless. Again, the prosecutor emphasized that there was no evidence that Panther had consumed drugs or alcohol and that, in fact, there was evidence affirmatively indicating that he had not consumed alcohol:

> Only if you were to conclude that it affected the driving and it was therefore irresponsible or negligent or reckless to drive if he were, you know, had been consuming something. That would be the only way it would affect you, but at this point you have no evidence that he had consumed any illegal substance, and in fact, as I recall the evidence, not only do you not have any evidence, you have evidence that he had a—that there was not alcohol in his system.

The grand jury thereafter commenced its deliberation. After deciding not to subpoena the Anchorage hospital records, the grand jury voted to issue an indictment charging Panther with manslaughter.

In his motion to dismiss the indictment, Panther argued that the state improperly allowed the grand jury to hear evidence that traces of controlled substances were found in Debra Panther's blood, that he and Debra Panther had previously been involved in incidents of domestic violence, that he and Debra Panther had spent part of the night before the collision at the Porpoise Room, and that his attorney had failed to cooperate in releasing the Anchorage hospital records to the police.

The superior court concluded that, even if the challenged evidence was improperly presented, "it was not such as to confuse the issues before the grand jury or to cause them to become unfair...." The court found that, even when considered cumulatively, the improper evidence would not have appreciably affected the return of the indictment. On appeal, Panther takes issue with the superior court's ruling. We conclude, however, that the superior court did not abuse its discretion in denying Panther's motion to dismiss the indictment.

■ As correctly recognized by the superior court, when improper evidence is presented to the grand jury, an indictment is subject to dismissal only if the remaining evidence is insufficient or if the improper evidence "appreciably affect[ed] the outcome of the grand jury's deliberations." *Newman v. State*, 655 P.2d 1302 (Alaska App.1982), *quoting Oxereok v. State*, 611 P.2d 913, 916 (Alaska 1980). We agree with Panther that the disputed evidence should not have been heard by the grand jury. Nevertheless, as we have already indicated, the remaining evidence was sufficient to support Panther's indictment. Furthermore, we are persuaded that the improper evidence did not appreciably affect the outcome of the grand jury's deliberations.

In our view, among the various items of improper evidence, Eastham's testimony concerning the refusal of Panther's counsel to release medical records was the only evidence which, standing alone, posed a substantial risk of prejudice. If misconstrued by the grand jury, this evidence could have been taken as an indication that Panther was attempting to conceal evidence of drug or alcohol consumption. There is little likelihood, however, that this evidence was actually misinterpreted. Eastham very clearly explained that the problem stemmed from a lack of cooperation by Panther's civil attorney, who believed that he had no authority to release the records without Panther's consent. Eastham made it clear that Panther had not refused or declined to consent but was simply out of state and unavailable. His attorney had declined to contact him, and Eastham had not had time to make contact himself. In context, this evidence, standing alone, would not have appreciably affected the grand jury's decision.

Even though the other items of improper evidence do not, in isolation, appear seri-

ously prejudicial, it is conceivable that the cumulative effect of the improper evidence could have caused substantial prejudice to Panther's case. The totality of the improper evidence added a strong undercurrent of potential prejudice by suggesting that Panther was an unworthy man who was under the influence of drugs at the time of the collision. Yet our review of the grand jury transcript convinces us that this potential for cumulative prejudice did not materialize.

Our decision is primarily influenced by the prosecutor's repeated admonitions to the grand jury. The prosecutor made it abundantly clear that there was no evidence whatsoever to support the conclusion that Panther had consumed any substance at the time of the collision and that, in fact, there was affirmative evidence indicating the contrary. The prosecutor also made it clear that, even if evidence had been presented indicating that Panther had consumed alcohol or drugs, it would be irrelevant unless there was some basis for concluding that his driving was influenced thereby.

We find little in the record to suggest that the grand jury disregarded the prosecutor's repeated admonitions. Panther insists that the various questions that grand jurors asked about possible drug or alcohol consumption demonstrate a preoccupation with the issue, despite the prosecutor's instructions. We disagree.

Although members of the grand jury exhibited considerable interest in learning whether Panther might have consumed alcohol or drugs, a close scrutiny of the grand jury's questions and comments supports the conclusion that the grand jury's primary concern was to determine whether to seek additional evidence from Panther's hospital records in Anchorage. Far from indicating preoccupation and prejudice stemming from the improper evidence, the grand jury's serious concern with whether a subpoena should be issued reveals its awareness that the records were the only evidence that might establish whether or not Panther had consumed drugs.

Recognizing the potential significance of the hospital records, the grand jury deliberated and decided not to subpoena them. Nothing in the record suggests that, in reaching this decision, the grand jury chose to disregard the prosecutor's instructions or that it elected to charge Panther with manslaughter on the wholly unsupported assumption that he might have consumed alcohol or drugs. Rather, the grand jury's conscious decision to forego the hospital records indicates its belief that Panther's indictment was justified by the circumstances of the collision, regardless of whether Panther had consumed alcohol or drugs. As we have already held, the evidence before the grand jury was legally sufficient to support this conclusion.

In summary, we find no basis for concluding that the improper evidence appreciably affected the grand jury's decision. Consequently, the trial court did not err in denying Panther's motion to dismiss the indictment.

■ Panther's final contention is that the trial court erred in refusing to instruct the jury that Debra Panther's failure to use a seat belt could be considered in determining whether Panther's conduct was a proximate cause of Debra Panther's death. This contention is without merit.

The state, in a criminal case, is not required to prove beyond a reasonable doubt that the defendant's negligence was the *sole* proximate cause of the death. Where a defendant negligently creates a risk of death to another person, the fact that the person actually died as a result of the combination of that negligence plus some other contributing factor does not serve to exculpate. So long as the defendant's acts are found by the jury to rise to the high level of "culpable negligence" and so long as the defendant's acts actually constitute a substantial factor in causing the death, absent any factors to justify or excuse, there is liability for the negligence.

*Wren v. State*, 577 P.2d 235, 240–41 (Alaska 1978) (footnotes omitted).

The state presented virtually uncontroverted evidence that Panther drove his car

across the centerline of the road and became involved in a collision that resulted in the death of his wife. Although it is certainly conceivable that Debra Panther's death might not have occurred had she worn a seat belt, there was no evidence at trial that could have led a rational juror to conclude that the collision was not "a substantial factor in causing the death." *Id.* Nor was any legal basis presented to the trial court to support a conclusion that Debra Panther's failure to wear a seat belt was a factor that would "justify or excuse" Panther's conduct. Accordingly, Debra Panther's failure to wear a seat belt could not have amounted to an intervening cause of her own death. *See, e.g., Kusmider v. State,* 688 P.2d 957, 959–60 (Alaska App. 1984). *See also State v. Nester,* 336 S.E.2d 187, 189 (W.Va.1985); *People v. Clark,* 171 Mich.App. 656, 431 N.W.2d 88, 90 (1988); *Frazier v. State,* 530 So.2d 986, 989 (Fla. App.1988). *See generally* R. Perkins and R. Boyce, *Criminal Law,* at 819–21 (3d Ed.1982).

Panther nevertheless maintains that *Wren v. State* supports his proximate cause argument. Panther's reliance on *Wren* is misguided. *Wren* acknowledged that an accident victim's conduct could be considered on the issue of proximate cause to the extent that the conduct interfered with the driver's control of his automobile and thereby contributed to a fatal collision. *Wren v. State,* 577 P.2d at 239. Nothing in *Wren,* however, supports the conclusion that an act by the victim that has no effect on the driver's conduct and that would not in itself be sufficient to cause death would have any bearing on the issue of proximate cause.

We conclude that the trial court's refusal to give Panther's proposed proximate cause instruction did not amount to error.

The judgment is AFFIRMED.