**Kenneth C. JACKSON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–4442.**

Court of Appeals of Alaska.

March 3, 1995.

---

Rex Lamont Butler, Anchorage, for appellant.

Nancy R. Simel, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

Kenneth C. Jackson was convicted by a jury of sexual assault in the second degree for engaging in sexual penetration with a mentally incapable person. AS 11.41.420(a)(3)(A). Superior Court Judge Milton M. Souter sentenced Jackson to a term of seven years with two years suspended. Jackson appeals, contending that the evidence at trial was insufficient to establish that his alleged victim was mentally incapable or that he knew of her incapacity; Jackson alternatively maintains that the statutory definition of "mentally incapable" is unconstitutionally vague. Jackson separately claims that his sentence is excessive, arguing that the trial court erred in rejecting two proposed mitigating factors. We affirm.

In August of 1990, Jackson had sexual intercourse with T.Y.J., a twenty-six-year-old mentally retarded woman who has an I.Q. of approximately 51–55. Several months later, a doctor informed T.Y.J.'s mother that T.Y.J. was pregnant. T.Y.J. identified Jackson as the man who had impregnated her; she stated that she had not wanted to engage in sexual intercourse with Jackson, but that Jackson had threatened to hit her if she refused. Upon being interviewed by the police, Jackson acknowledged having had sexual intercourse with T.Y.J. but claimed that the intercourse had been consensual and that he had been unaware of T.Y.J.'s mental incapacity.

Jackson was subsequently charged with and tried for one count of first-degree sexual assault (based on an allegation of nonconsensual sexual intercourse) and one count of second-degree sexual assault (based on an allegation of T.Y.J.'s mental incapacity). Jackson twice moved for a judgment of acquittal as to the second-degree sexual assault charge, claiming insufficient evidence. The trial court denied the motions. The jury acquitted Jackson of first-degree sexual assault but convicted him of the second-degree charge.

■ The second-degree sexual assault charge alleged a violation of AS 11.41.420(a)(3)(A). This provision defines second-degree sexual assault to include an act of sexual penetration "with a person who the offender knows is ... mentally incapable[.]" At trial, the state presented no expert testimony to prove that T.Y.J. was "mentally incapable." Instead, it relied on the testimony of T.Y.J.'s mother and on the jury's ability to observe the manner in which T.Y.J. spoke and acted, both when she testified at trial and during a pretrial police interview, a videotape of which was introduced at trial. Jackson argues on appeal, as he did below, that, absent expert testimony, there was insufficient evidence to support a finding that T.Y.J. was "mentally incapable" within the meaning of the second-degree sexual assault statute.

This argument is unpersuasive. T.Y.J.'s personal appearance before the jury and her videotaped pretrial interview with the police provided compelling evidence of her incapacity. In her testimony and pretrial interview,

T.Y.J. had difficulty responding to simple questions and often paused for lengthy periods before answering; she gave her answers in at most a few words. At the outset of her trial testimony, T.Y.J. said she did not know the meaning of truth but did know the difference between right and wrong. Even a cursory viewing of the videotaped police interview suffices to establish that T.Y.J.'s impairment is both profound and obvious.

T.Y.J.'s responses to questions concerning sexual matters confirmed her limited knowledge. She displayed only a rudimentary awareness of the mechanics of sexual intercourse. She was aware that babies came from "sex": that a baby comes "[o]ut of my stomach" and that it got in her stomach "[f]rom just having sex." In a very basic way, T.Y.J. could demonstrate "sex," using a male and female doll.[1] However, T.Y.J. did not understand birth control, how to prevent pregnancy, or what sexually transmitted diseases are or how to prevent them.[2] She did not know the meaning of words such as IUD, condom, rubber, syphilis, gonorrhea, or AIDS. Apart from her awareness that pregnancy resulted in the birth of a baby, T.Y.J. did not understand any of the practical consequences or potential complications of pregnancy.

■ In addition to observing and listening to T.Y.J., the jury heard extensive testimony from T.Y.J.'s mother, whose lifelong relationship to T.Y.J. and intimate knowledge of her daughter's condition made her peculiarly well qualified to give lay testimony.[3] T.Y.J.'s mother testified that T.Y.J. had been diagnosed as mentally retarded shortly after birth; as a twenty-six-year-old adult, T.Y.J. functioned at the level of a kindergartner and was intellectually less advanced than many of the three- to five-year-olds that T.Y.J.'s mother supervised as a child-care provider. According to T.Y.J.'s mother, although T.Y.J. had attended special education classes and had completed high school, she could not do simple arithmetic and lacked all but the most rudimentary reading and writing skills: T.Y.J. could write nothing except her name; and apart from being able to recognize her address, telephone number, and certain "survival words" such as an exit or stop sign or 911, she was unable to read.

1. During T.Y.J.'s pretrial interview, the police made available to T.Y.J. anatomically correct male and female dolls that were dressed in removable clothing. After fully explaining the dolls, the police asked T.Y.J. if she could use them to demonstrate "sex." She answered that she could. T.Y.J. initially took only the male doll and had to be reminded that she would also need the female. In her first attempt to demonstrate sex, T.Y.J. simply laid the clothed male doll on top of the clothed female.

2. In fact, T.Y.J. did not understand what an ordinary disease is.

3. *Cf.* Alaska Rule of Evidence 701 (allowing opinion testimony by lay witnesses when "rationally based on the perception of the witness and helpful to a clear understanding of [the witness'] testimony." For a similar rule applied in a context analogous to that of the present case, see also *Globe American Casualty Company v. Lyons*, 131 Ariz. 337, 641 P.2d 251, 255 (App.1982) (requiring, as a prerequisite to admission of lay testimony on the issue of insanity, "an intimacy between the witness and the defendant of such a character and duration that the witness' testimony is of probative value" on the issue).

By a curious twist of logic, Jackson relies on *Globe American* for the proposition that T.Y.J.'s presence before the jury and the testimony of T.Y.J.'s mother were insufficient to support a finding of incapacity in this case. Jackson attempts to apply the *Globe American* requirement of "intimate" knowledge by a lay witness, not to the lay witness in his case—T.Y.J.'s mother—but rather to the jury itself. Jackson posits that the jury's brief exposure to T.Y.J. and to the testimony of T.Y.J.'s mother would be insufficient to amount to "intimacy" between the jurors and T.Y.J. "of such a character and duration" as to qualify individual jurors to testify as lay witnesses concerning T.Y.J.'s incapacity. Implicitly likening a jury verdict to a lay witness' opinion, Jackson reasons that the jury could not have been qualified to render a verdict on the issue of T.Y.J.'s incapacity based on the evidence it heard; from this, Jackson concludes that expert testimony should have been required.

Jackson's reasoning is seriously flawed. Parallel logic would compel the conclusion that Jackson's jury would not have been qualified to decide the issue of T.Y.J.'s incapacity even if expert testimony had been presented: individual jurors, lacking in expertise other than that presented in the form of expert testimony at trial, would hardly have been qualified to testify as experts on the issue of T.Y.J.'s condition, and so, under Jackson's theory, could not have returned a meaningful verdict on the issue. In sum, a sufficient answer to Jackson's argument is that a lay witness' testimony and a jury's verdict are two different things.

T.Y.J.'s mother recounted that, from 1982 until approximately April of 1989, T.Y.J. had lived in Hope Cottage, a residential program providing for the special needs of mentally or physically handicapped persons. While there, T.Y.J. had been provided with sex education. Because of her limited intellectual ability, however, T.Y.J. did not succeed at Hope Cottage and left the program. She moved back to her mother's home, and her mother was formally appointed as T.Y.J.'s legal guardian. Since returning home, T.Y.J. had been trained to ride the bus from her house to Wendy's, where she worked cleaning tables and trays. She also regularly went to ARCA, a recreation and learning center for people with special needs. As a result of her condition, T.Y.J. received social security and veterans administration disability benefits.

By the time of trial, T.Y.J. had given birth to the child she had conceived with Jackson. T.Y.J.'s mother told the jury that T.Y.J. was unable to care for her child by herself, could not measure the baby formula, and did not know what temperature to fix the water for a bath. T.Y.J. was not able to ensure that her baby received proper medical care and did not understand about diseases. Although capable of dressing her baby, T.Y.J. often dressed the child inappropriately for the weather. T.Y.J. did not understand that the baby's needs came before her own.

As we have already indicated, Alaska's second-degree sexual assault statute prohibits sexual penetration "with a person who the offender knows is ... mentally incapable[.]" A person is "mentally incapable" of consenting to an act of sexual penetration when the victim suffers from "a mental disease or defect that renders the person incapable of understanding the nature or consequences of the person's conduct, including the potential for harm to that person[.]" AS 11.41.470(2).[4]

Although Alaska courts have never decided whether expert testimony must be presented to prove a victim's mental incapacity in a

second-degree sexual assault prosecution, other jurisdictions have held that no such requirement exists:

> Evidence which establishes a rape victim's inability to understand the nature and·consequences of sexual intercourse is not the kind of technical evidence which requires medical testimony to decipher.... [A] witness' comprehension of the basic consequences of his or her actions can be proved or disproved from his or her testimony and testimony as to behavior.

*State v. Summers,* 70 Wash.App. 424, 853 P.2d 953, 956 (1993). Sufficient evidence of incapacity may be based on the jury's assessment of the victim's testimony and demeanor:

> The most striking evidence in support of the trial court's determination that there was substantial evidence to support the jury's finding that the woman could not legally consent to sexual intercourse with [the defendant] was the appearance of the victim herself.... The trial court found her answers to be slow and short; her facial expressions consisted of a "sagging jaw, mouth open ... she appeared to stare off into space at times."

*State v. Soura,* 118 Idaho 232, 796 P.2d 109, 115 (1990). *See also Wootton v. State,* 799 S.W.2d 499, 501 (Tex.App.1990). *See generally* K.H. Larsen, Annotation, *Rape or Similar Offense Based on Intercourse with Woman Who Is Allegedly Mentally Deficient,* 31 A.L.R.3d 1227, 1259–64 (1970 & Supp.1994).

T.Y.J.'s rudimentary understanding of the mechanics of sexual intercourse plainly fell short of the kind of awareness contemplated by the statutory definition. Other jurisdictions with statutes similar to Alaska's agree that the victim's mere understanding of the physical act of sex is not equivalent to an appreciation of the nature and consequences of the victim's conduct:

---

**4.** "Mental disease or defect" is, in turn, defined in AS 12.47.130(3) as:

a disorder of thought or mood that substantially impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life; "mental disease or de-

fect" also includes mental retardation, which means a significantly below average general intellectual functioning that impairs a person's ability to adapt to or cope with the ordinary demands of life.

> Although the victim ... apparently knew what an act of sexual intercourse entails, had some understanding of the physical nature of sexual activity, and knew "where babies come from," that is not the end of the inquiry of whether ... the victim is capable of "understanding the act, its nature and possible consequences."

*People v. McMullen,* 91 Ill.App.3d 184, 187, 46 Ill.Dec. 492, 495, 414 N.E.2d 214, 217 (1980) (citations omitted); *see also People v. Boggs,* 107 Cal.App. 492, 290 P. 618, 619 (1930); *State v. Gonsalves,* 5 Haw.App. 659, 706 P.2d 1333, 1338 (1985), *overruled on other grounds, State v. Kelekolio,* 74 Haw. 479, 849 P.2d 58, 80 n. 23 (1993); *People v. Easley,* 42 N.Y.2d 50, 396 N.Y.S.2d 635, 639, 364 N.E.2d 1328, 1332 (1977); *State v. Fox,* 72 S.D. 119, 31 N.W.2d 451, 455 (1948); *Summers,* 853 P.2d at 957.

■ To appreciate the nature and consequences of engaging in an act of sexual penetration, the victim must have the capacity to understand the full range of ordinary and foreseeable social, medical, and practical consequences that the act entails:

> Without the ability to comprehend these factors, the victim cannot be said to be capable of appraising the nature of the act. She would see only the shiny wrappings on Pandora's box, and none of the contents. She would be truly, in the old-fashioned phrase, taken advantage of.

*Gonsalves,* 706 P.2d at 1338 (footnote omitted).

In the present case, there was an abundant evidentiary basis to support a jury finding that T.Y.J. did not understand the nature and consequences of engaging in an act of sexual intercourse. Jackson nevertheless argues that the evidence presented at trial, as outlined above, showed merely that T.Y.J. did not understand about sex and pregnancy, not that she lacked the capacity to understand. Since the statutory definition of "mentally incapable" focuses on what the victim is capable of knowing rather than on the victim's actual knowledge, Jackson claims that expert testimony should have been required to provide the jury with sufficient evidence to establish that T.Y.J. was incapa-

ble of understanding the consequences of sexual intercourse.

A person's capacity to understand something, however, is a factual issue for the jury and, like other facts, may properly be established by circumstantial evidence. More particularly, evidence explaining what a person knows and how the person came to know it may well give rise to an inference of incapacity.

From the evidence presented at trial, it appears that T.Y.J. possessed no more than a childlike awareness of the nature and consequences of sexual intercourse and did not know how to care for an infant. Given that T.Y.J. was twenty-seven years of age, had completed high school, had received sex education training, had resided for years in a residential program for persons with special needs, and had recently given birth to a child, the jury could readily infer that her lack of knowledge reflected a lack of capacity to learn, and not just a failure to become informed.

■ In determining whether sufficient evidence was presented at trial to support a conviction, we must view the record and the inferences arising therefrom in the light most favorable to the state. *Bush v. State,* 397 P.2d 616 (Alaska 1964); *Alam v. State,* 776 P.2d 345, 347 (Alaska App.1989). We must find the evidence sufficient if the record, so viewed, would support "a conclusion by a reasonable mind that there was no reasonable doubt about the defendant's guilt." *Alam,* 776 P.2d at 347; *Ratliff v. State,* 798 P.2d 1288, 1290 (Alaska App.1990). Viewing the evidence in the light most favorable to the state, we find that there was ample evidence to support a reasonable conclusion that the state met its burden of proving beyond a reasonable doubt that T.Y.J. was mentally incapable of meaningfully consenting to sexual intercourse.

■ Jackson separately argues that insufficient evidence was presented at trial to establish that he acted with the requisite culpable mental state. Alaska's second-degree sexual assault statute requires actual knowledge of the victim's mental incapacity; a conviction under AS 11.41.420(a)(3)(A) is

permissible only if the offender "engages in sexual penetration with a person who the offender knows is ... mentally incapable[.]" Jackson contends that, even if the jury could properly have concluded that T.Y.J. was mentally incapable, it could not have found that Jackson actually knew of her condition.

■ To prove that Jackson knew of T.Y.J.'s incapacity, however, the state was not required to demonstrate absolute certainty on Jackson's part. A person acts "knowingly" when the "person is aware that the conduct is of that nature or that the circumstance exists"; "knowledge is established if a person is aware of a substantial probability of its existence." AS 11.81.900(a)(2). Moreover, knowledge is ordinarily proven by circumstantial evidence, since it can seldom be proven directly. "Under normal circumstances a mental incapacity to consent would be apparent in ordinary social intercourse." *Keim v. State*, 13 Kan.App.2d 604, 777 P.2d 278, 280 (1989).

There is substantial circumstantial evidence in the trial record to support an inference that Jackson acted with awareness of a substantial probability that T.Y.J. was mentally incapable. As we have already indicated, the videotaped police interview alone makes it obvious that T.Y.J. is profoundly impaired. After viewing the videotaped interview and hearing testimony from T.Y.J. and T.Y.J.'s mother, the jury could properly have concluded that T.Y.J.'s incapacity would be apparent even to a person who had only brief and casual contact with her. Moreover, the state presented evidence indicating that Jackson was acquainted with T.Y.J. before the incident that led to his conviction: Jackson acknowledged that he had previously met T.Y.J.'s brother and sister, and T.Y.J. stated that when she first met Jackson on the day of the alleged assault, Jackson called her by her first name.

Viewed in the light most favorable to the state, these circumstances easily might have led reasonable jurors to conclude beyond a reasonable doubt that Jackson acted with

knowledge that T.Y.J. was mentally incapable. A case in point is *People v. Farrokhi*, 91 Ill.App.3d 421, 46 Ill.Dec. 868, 414 N.E.2d 921 (1980). Farrokhi was convicted of sexual assault for having sexual intercourse with a mentally retarded victim. He claimed that he had no knowledge of the victim's mental condition because he spent less than one hour with the victim and conversed with her very little before engaging in intercourse. *Id.* at 426, 46 Ill.Dec. at 873, 414 N.E.2d at 926. At trial, the victim testified, not in complete sentences, but in two- or three-word phrases. The victim had a mental age between four and six years, and though she had fourteen years of schooling, could not read or write (other than writing her first name). *Id.*

On appeal, noting that a defendant's knowledge is "ordinarily" established by circumstantial evidence, the court found the evidence sufficient to establish that Farrokhi acted knowingly. *Farrokhi*, 91 Ill.App.3d at 426, 46 Ill.Dec. at 873, 414 N.E.2d at 926. Specifically, the court found that Farrokhi had "sufficient opportunity to observe the victim's severely limited mental capabilities and could not have avoided the obvious nature of her mental deficiency[.]" *Id.* The court concluded that it was "highly unlikely" that the defendant did not discover the victim's mental deficiency, "particularly where he was her sole companion during this time." *Id.*

In summary, we find no lack of evidence on the issues of T.Y.J.'s mental incapacity or Jackson's knowledge of that incapacity and we conclude that the superior court did not err in denying Jackson's motions for acquittal.

■ Jackson alternatively claims that, even if we find the evidence sufficient to support his conviction, we should declare the second-degree sexual abuse statute unconstitutional because Alaska's definitions of "mentally incapable" and "mental disease or defect" are vague and overbroad.[5]

5. A claim of unconstitutionality based on vagueness and overbreadth potentially involves three distinct components: (1) is the statute "so imprecisely drawn and overbroad that it 'chills' the exercise of first amendment rights"; (2) does the statute "give adequate notice of the conduct that is prohibited"; and (3) does the statute's "imprecise language encourage[] arbitrary enforcement

A statute fails to provide adequate notice "when it is so imprecise that ordinary persons of common intelligence are left to guess at its meaning and are apt to differ as to its scope." *Konrad v. State*, 763 P.2d 1369, 1379 (Alaska App.1988). Jackson maintains that persons of common intelligence must necessarily guess at the meaning of such broad statutory phrases as "the nature and consequences of the person's conduct, including the potential for harm," [6] "substantially impairs judgment," "significantly below average general intellectual functioning," and "the ordinary demands of life." [7] Jackson reasons that in place of such general terms a properly drafted statute should list specific objective criteria to notify the public of "the line which must not be crossed." He contends that the second-degree sexual assault statute, as written, places every Alaskan at risk of criminal prosecution whenever they engage in sexual activity with one of "less than average intelligence."

■ However, mathematical precision is unnecessary to satisfy the requirement of fair notice; some imprecision in definitions is unavoidable. *Panther v. State*, 780 P.2d 386, 390 (Alaska App.1989). The lack of a bright-line test will not render a statute unconstitutionally vague if, "[a]lthough difficult to define concretely, the statutory requirement ... is readily comprehensible." *Id.* at 391. As this court noted recently in *De Nardo v. State*, 819 P.2d 903 (Alaska App.1991):

> the fact that people can, in good faith, litigate the meaning of a statute does not necessarily (or even usually) mean that the statute is so indefinite as to be unconstitutional. The question is whether the statute's meaning is unresolvably confused or ambiguous *after* it has been subjected to legal analysis. If study of the statute's wording, examination of its legislative history, and reference to other relevant statutes and case law makes the statute's meaning clear, then the statute is constitutional.

*Id.* at 908 (emphasis in original) (citations omitted).

In *Nash v. United States*, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232 (1913), the United States Supreme Court observed: "[T]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." In a similar vein, the Alaska Supreme Court has stated that "[t]here are many instances in which the law resorts to the general understanding of the community as the standard of legal result." *Harris v. State*, 457 P.2d 638, 647 (Alaska 1969). The court in *Harris* indicated that the use of such a standard would run afoul of the requirement of fair notice only when "the conduct to be prohibited by a criminal statute is capable of objective definition by language descriptive of precise physical acts and events[.]" *Id.*

Applying these principles to the case at hand, we find no lack of adequate notice. The challenged statutory definitions of mental incapacity and mental disease or defect involve inherently abstract concepts that hardly lend themselves to "objective definition by language descriptive of precise physical acts." [8] *Id.* Moreover, there is nothing unfamiliar or offensive in the use of broad

---

by allowing prosecuting authorities undue discretion[.]" *Summers v. Anchorage*, 589 P.2d 863, 866–67 (Alaska 1979). Jackson's claim involves only the second component, the adequate notice requirement. Jackson does not argue that his first amendment rights are implicated. *See Sanuita v. Common Laborer's & Hod Carriers Union*, 402 P.2d 199 (Alaska 1965) (first amendment issues mentioned only casually will not be considered on appeal). Although Jackson summarily asserts that the vague statutory definitions permit arbitrary enforcement, he fails to establish any history of such enforcement. *See id.* at 868 (statute will not be invalidated based on potential for arbitrary enforcement absent a history of such enforcement).

6. The phrase is included in the statutory definition of "mentally incapable," AS 11.41.470(2).

7. These phrases are contained in the statutory definition of "mental disease or defect," AS 12.47.130(3).

8. As Judge Souter said in rejecting Jackson's claim of vagueness, the statutory definitions appear to be "as clear and unambiguous as human language will allow."

terms such as those found in the statutory definition of "mentally incapable."[9]

Furthermore, the culpable mental state requirement of Alaska's second-degree sexual assault statute provides a measure of protection against potential vagueness in the statutory terminology. Because AS 11.41.420(a)(3) obligated the state to prove that Jackson acted knowingly with regard to T.Y.J.'s mental incapacity, the jury was required to find beyond a reasonable doubt that Jackson himself actually understood that T.Y.J. was mentally incapable. Any inherent uncertainty in the definition of "mentally incapable" would thus have worked to Jackson's advantage, for it would have tended to preclude him from knowing that T.Y.J. was mentally incapable. Cf. *Jones v. Anchorage,* 754 P.2d 275, 278 (Alaska App.1988) (ordinance prohibiting harassing conduct towards others not vague when prosecution required to prove that accused acted with specific intent to harass).

Finally, it is well settled that a statute whose application may be uncertain in marginal cases need not be declared invalid "if the offense charged falls squarely within its prohibitions[.]" *Summers v. Anchorage,* 589 P.2d 863, 867 (Alaska 1979). As we have indicated earlier in this opinion, Jackson's case is not a close one. The profound nature of T.Y.J.'s impairment places her case squarely within the statutory definition of "mentally incapable"; the obviousness of the impairment provides firm evidentiary footing for the conclusion that Jackson acted knowingly with respect to T.Y.J.'s incapacity.

Other jurisdictions with criminal statutes similar to Alaska's second-degree sexual assault law have not hesitated in rejecting constitutional challenges based on claims of vagueness. In *State v. Degrenier,* 120 N.H. 919, 424 A.2d 412, 413 (1980), the New Hampshire Supreme Court upheld a statute criminalizing sexual penetration with a victim who "is mentally defective and the actor knows or has reason to know that the victim is mentally defective." Although the court found that the statute failed to make clear the degree of mental defectiveness required to establish a conviction, it nevertheless concluded that the statute was sufficient "to give the defendant fair warning that, by engaging in sexual intercourse with one who he knows or has reason to know is mentally defective in any recognizable and appreciable degree, he is violating the statute." *Id.*

Similarly, in *Keim v. State,* 777 P.2d at 279, 280–81, the Kansas Supreme Court upheld a law prohibiting sexual intercourse "when the victim is incapable of giving consent because of mental deficiency or disease, which condition was known by the offender[,]" finding that the statutory wording

> sufficiently warns a person of common intelligence that ... sexual intercourse with one who is mentally handicapped to a degree that he or she cannot understand the nature and consequences of engaging in the act is prohibited. Under normal circumstances a mental incapacity to consent would be apparent in ordinary social intercourse. The fact that further questioning may be necessary in some cases to determine if one's partner fully understands the nature and consequences of sexual intercourse does not render the statute unconstitutional.

In short, the disputed statutory language in this case is not "so imprecise that ordinary persons of common intelligence are left to guess at its meaning and are apt to differ as to its scope." *Konrad,* 763 P.2d at 1379. The trial court did not err in rejecting Jackson's claim of vagueness and overbreadth.

---

9. Several examples will suffice to illustrate the point. In *Stock v. State,* 526 P.2d 3, 10 (Alaska 1974), the Alaska Supreme Court held that criminal liability could properly be defined to include "potentially" harmful conduct, provided that the state proved "that the threatened injury was foreseeable to a reasonable man in the position of the defendant at the time of the act or omission." The statutory definition of "recklessly," *see* AS 11.81.900(a)(3), is applied as a threshold of criminal liability throughout Alaska's revised criminal code; this definition employs terms such as "substantial and unjustifiable risk," and "gross deviation from the standard of conduct that a reasonable person would observe in the situation[.]" And the definition of insanity, *see* AS 12.47.010(a), which has traditionally been applied to absolve defendants of criminal responsibility, hinges criminality on the defendant's ability "to appreciate the nature and quality of [the] conduct" constituting the offense.

■ Jackson next contends that the trial court erred in instructing the jury on proof beyond a reasonable doubt. Before the completion of trial, Jackson submitted a reasonable doubt instruction his counsel had previously used in a federal case; the trial court declined to give the proposed instruction, relying instead on the reasonable doubt instruction it routinely used. Jackson claims that his proposed instruction should have been given.[10] He complains that certain language in the instruction actually given is potentially misleading and difficult to understand.[11]

■ The trial court must "instruct the jury on all matters of law which it considers necessary for the jury's information[.]" Alaska Criminal Rule 30(b). In keeping with this rule, the defendant is entitled to have the jury instructed on the defense theory of the case; ordinarily, however, when a standard instruction correctly and completely states the law on a point, the trial court will not abuse its discretion in rejecting a proposed instruction tailored to the facts of the case at issue. *Stoneking v. State*, 800 P.2d 949, 950 (Alaska App.1990).

In the present case, the reasonable doubt instruction actually used below is both complete and legally sound; Jackson's arguments concerning its deficiencies are strained, at best.[12] Moreover, Jackson voices these complaints for the first time on appeal. At trial, he did not object to the specific wording of the trial court's reasonable doubt instruction; in fact, he did not object to the instruction at all. He merely submitted his own proposed instruction, stated that he preferred it, and requested that it be given. We find no abuse of discretion in the trial court's rejection of Jackson's proposed instruction.

■ Jackson lastly appeals his sentence. Sexual assault in the second degree is a class B felony, for which the maximum term of imprisonment is ten years. AS 11.41.420(b); AS 12.55.125(d). As a second felony offender, Jackson was subject to a presumptive term of four years. AS 12.55.125(d)(1). Judge Souter found one aggravating factor applicable to Jackson's case: that Jackson was on felony probation at the time of the sexual assault, AS 12.55.155(c)(20). The judge rejected two mitigating factors proposed by Jackson: that his conduct was among the least serious included in the definition of the offense, AS 12.55.155(d)(9), and that the harm caused by his criminal conduct was consistently minor and did not warrant

10. Jackson's proposed instruction read:
   Few things in this world can be known with absolute certainty, so the law does not require proof even in a criminal trial which overcomes every possible doubt and establishes the facts to a certainty. But a belief that a person may have done something, or even that he probably did something, is not enough to support a conviction.

11. The reasonable doubt instruction actually given read:
   The distinguishing features of a criminal trial are what are known in the language of the law as the presumption of innocence and the burden of proof beyond a reasonable doubt. The law presumes a defendant to be innocent of crime. Thus, a defendant, although accused, begins the trial with a clean slate—with no evidence favoring conviction. The presumption of innocence alone is sufficient to acquit a defendant, unless and until you are satisfied beyond a reasonable doubt of the defendant's guilt, after careful and impartial consideration of all the evidence in the case.
   This last-mentioned requirement, that you be satisfied beyond a reasonable doubt of defendant's guilt, is what is called the burden of proof. It [is] not required that the prosecution prove guilt beyond all possible doubt, for it is rarely possible to prove anything to an absolute certainty. Rather, the test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense. Proof beyond a reasonable doubt must be proof of such a convincing character that, after careful consideration, you would be willing to rely and act upon it without hesitation in your important affairs. A defendant is never to be convicted on mere suspicion or conjecture.

12. Jackson centers his argument on two aspects of the trial court's instruction. The first involves the instruction's admonition that the jury was to presume innocence "unless and until" it was satisfied of guilt beyond a reasonable doubt. Jackson maintains that use of the word "until" in the phrase "unless and until" implied that, at some point, the jury was expected to find proof beyond a reasonable doubt. The second aspect of Jackson's argument involves language advising the jury that "[a] defendant is never to be convicted on mere suspicion or conjecture." Jackson argues that words like "suspicion" and "conjecture" are too abstract and vague to be understood by ordinary jurors.

the imposition of a substantial period of incarceration, AS 12.55.155(d)(13). Judge Souter sentenced Jackson to an adjusted presumptive term of seven years with two years suspended and three years' probation.

■ On appeal, Jackson argues only that the trial court erred in rejecting his proposed mitigating factors. This court must uphold the sentencing court's findings with respect to the accused's proof of a proposed mitigating factor unless the findings are clearly erroneous. *Juneby v. State,* 641 P.2d 823, 834 & n. 17 (Alaska App.1982), *modified on other grounds,* 665 P.2d 30 (Alaska App. 1983). Here, the record supports the conclusion that the sentencing court was not clearly erroneous in rejecting either proposed factor.

Jackson's argument that his conduct was among the least serious included in the definition of second-degree sexual assault depends on two related premises: first, that Jackson was convicted based on mere recklessness as to T.Y.J.'s mental incapacity; second, that reckless conduct is necessarily less serious than knowing or intentional conduct. Both premises are mistaken. As required by the express language of AS 11.41.420(a)(3)(A), Jackson was convicted of acting knowingly, not recklessly, with respect to T.Y.J.'s mental incapacity. Moreover, in construing the least serious conduct mitigating factor, this court has consistently taken the position that "reckless conduct is not *per se* less serious than knowing or intentional conduct." *Adams v. State,* 718 P.2d 164, 167 (Alaska App.1986) (citing *New v. State,* 714 P.2d 378, 382 n. 2 (Alaska App.1986); and

*Walsh v. State,* 677 P.2d 912, 916–18 (Alaska App.1984)).

In declining to find that Jackson's conduct was among the least serious included in the definition of the offense, Judge Souter observed:

It's a full act of sexual intercourse. It went through to full completion. There is absolutely nothing mitigated about this situation. This is exactly the type of conduct that the statute is directly aimed at.

This finding is not clearly erroneous.

■ Jackson's claim of error as to mitigating factor (d)(13) is equally flawed. To establish this factor, it was incumbent on Jackson to prove that the harm caused by his current and past acts of criminal misconduct has been consistently minor and was inconsistent with a substantial term of imprisonment. Our conclusion that the sentencing court was not clearly mistaken in declining to find Jackson's current conduct among the least serious in its class defeats Jackson's claim that the harm caused by his current conduct is minor. In addition, the circumstances surrounding Jackson's prior felony conviction—a third-degree assault—appear to be far from minor.[13] We find no clear error in Judge Souter's rejection of this proposed factor.

Having independently reviewed the entire sentencing record, we conclude that the sentence imposed below was not clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).

---

13. It appears from the record that Jackson's prior third-degree assault conviction was based on an incident in which he lay in wait for his two victims, beat one on the shoulder with a baseball bat, shot the other in the rib cage, and smashed their vehicles with the bat. The only indication of mitigation is that Jackson's assault had evidently been provoked by the prior conduct of his victims.

To establish, despite these circumstances, that his prior assault was minor in nature, Jackson relies exclusively on the fact that he received a suspended imposition of sentence for that offense. Characterizing the suspended imposition of sentence as a finding by the original sentencing court of least serious conduct, Jackson argues that this finding should have been binding on Judge Souter and is binding on this court.

However, a sentencing court's decision to give a suspended imposition of sentence to a first offender can as readily reflect the court's view of the offender's favorable prospects for rehabilitation as its assessment of the seriousness of the offender's conduct. Hence, the naked fact that an offender received a suspended imposition of sentence does not amount to a finding of minor harm or exceptionally mitigated conduct. And because a suspended imposition of sentence reserves to the sentencing court the power to impose any statutorily authorized sentence in the event of a future probation violation, a judge's decision to suspend the imposition of an offender's sentence does not in itself amount to a finding that the offender's conduct is necessarily inconsistent with a substantial term of imprisonment.

The conviction and sentence are AFFIRMED.