James AYULUK, as Conservator for Ruth Ayuluk, Appellant/Cross–Appellee,

v.

RED OAKS ASSISTED LIVING, INC.; Susan R. Reeves; Richard L. Reeves; Leslee K. Orebaugh; Parkside Assisted Living, Inc., d/b/a Rosewood Assisted Living; and Gary W. Austin, Sr., Appellees/Cross–Appellants.

Nos. S–11981, S–12502, S–12522.

Supreme Court of Alaska.

Feb. 20, 2009.

Rehearing Denied March 16, 2009.

Richard E. Vollertsen, Christopher J. Slottee, Atkinson, Conway & Gagnon, Anchorage, for Appellant/Cross–Appellee.

Peter J. Maassen, Ingaldson, Maassen & Fitzgerald, P.C., Anchorage, for Appellees/Cross–Appellants Red Oaks Assisted Living, Inc., Susan Reeves, and Richard Reeves.

John C. Pharr, Anchorage, for Appellees/Cross–Appellants Leslee Orebaugh and Parkside Assisted Living, Inc., d/b/a Rosewood Assisted Living.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

Ruth Ayuluk has impaired mental capacity as a result of a brain injury. While she was a resident of the Red Oaks Assisted Living Home, Gary Austin, an employee of the home and one of Ruth's caregivers, had sex with her on numerous occasions. When this was discovered Ruth's conservator sued Austin, Red Oaks, Red Oaks's owners Susan and Richard Reeves, Leslee Orebaugh, Red Oaks's designated administrator, and Orebaugh's company Parkside Assisted Living, Inc. Red Oaks and Orebaugh later joined Jill Friedman, Ruth's care coordinator, as a third-party defendant. A jury trial was con-

ducted. The jury found that while Ruth often consented to sex with Austin, she did not consent on ten occasions. For these occasions, Austin was found liable for sexual battery. The jury awarded Ruth compensatory damages against Austin of $1,000 and punitive damages of $6,500. The other defendants were exonerated. On appeal, numerous evidentiary and instructional errors are argued. We conclude that some of them have merit and remand for a new trial against Red Oaks and the Reeveses. The appellees cross-appeal on a discovery issue and an order requiring that they pay fees and costs as a condition of granting their motion to join Friedman, which required that the trial date be continued. They were required to pay $74,416 under the order. We conclude that this award must be recalculated on remand.

## II. FACTS AND PROCEEDINGS

On May 7, 1995, Ruth Ayuluk suffered a disabling brain injury while riding an ATV. Her parents, Andrew and Theresa Ayuluk, were appointed to be her conservators.[1] The settlement of a personal injury case left Ruth with substantial funds that are managed by a trust committee. The committee appointed Jill Friedman to be Ruth's case manager. Friedman placed Ruth in Red Oaks Assisted Living Home. She selected Red Oaks because its care was aimed at a younger population than most assisted living homes in Anchorage. Ruth entered Red Oaks on June 4, 1999, and Friedman provided a care plan detailing Ruth's limitations and needs.

Susan and Richard Reeves are the owners of Red Oaks and are licensed as operators of assisted living homes.[2] Leslee Orebaugh is Susan Reeves's mother and owns another assisted living home company, Parkside Assisted Living, Inc.[3] Orebaugh was an administrator designee for Red Oaks, a position required by state regulations. Under 7 Alaska Administrative Code (AAC) 75.210(a)(2) an assisted living home must appoint both an administrator to manage the daily operations of the home and an administrator designee who is to act for the administrator when the administrator is not available for more than twenty-four hours. Beyond her designation as an administrator designee, the extent of Orebaugh's involvement with Red Oaks was disputed at trial.

Gary Austin was hired by Red Oaks as a caregiver. He was a certified nurse's aide (CNA), but the parties disputed whether he was employed by Red Oaks in that capacity. Orebaugh became acquainted with Austin when she was appointed by the state to administer an assisted living home that the state was in the process of closing. Austin was employed by this home until it was closed. During Orebaugh's three-week tenure at the home, she learned of allegations that Austin had previously brought a pornographic tape to work and that he had come to work under the influence of alcohol. Orebaugh discussed appropriate boundaries with Austin, but did not attempt to ascertain the truth of the allegations.

Orebaugh told Susan Reeves about Austin when Reeves mentioned that Red Oaks was looking for an employee. At trial, the parties disputed whether Orebaugh recommended Austin or simply informed Reeves he was available. Orebaugh told Reeves of the allegations regarding pornography before Red Oaks hired Austin. Reeves also learned of the allegations regarding alcohol prior to hiring Austin.[4]

While at Red Oaks, Austin acted in a sexually inappropriate manner towards co-worker Cynthia York and Sarah Shine, a caregiver employed by Friedman to work with Ruth. Austin's behavior was reported to both Susan Reeves and Orebaugh. York and

1. Subsequently, Ruth's brother James was appointed as her conservator. We refer to him as the plaintiff in this opinion.

2. References throughout this opinion to Red Oaks include the Reeveses.

3. When we refer to Orebaugh as a party we also include Parkside.

4. Susan Reeves learned of the allegation regarding alcohol in a conversation with Cindy York. Orebaugh also indicated that she might have discussed the alcohol rumor with Reeves, but Reeves testified that she had not discussed the allegation regarding alcohol with Orebaugh.

Shine also informed Susan Reeves of concerns that Austin was acting inappropriately towards Ruth, including rubbing her shoulders and stroking her hair. In addition, York informed Susan Reeves that a crying resident was found to have bruises on her thighs shortly after Austin's shift ended. The extent of Red Oaks's responses to these incidents and the relevance of these incidents were disputed by the parties.

On October 24, 1999, Friedman removed Ruth from Red Oaks because her behavior had become emotionally unstable. Shortly thereafter, Ruth disclosed that she had sexual relations with Austin. Austin admitted to having sexual relations with Ruth, including vaginal, oral, and anal sex, but maintained that the sexual relationship was consensual. Ruth stated that some of the sex was consensual, but also that she sometimes engaged in sexual activity that she did not feel comfortable doing. Ruth's conservator maintains that Ruth does not have the mental capacity to consent to sexual relations with an authority figure such as a caregiver.

In 2001 plaintiff sued Austin, Red Oaks, the Reeveses, Orebaugh, and Parkside for bodily injury and emotional distress arising out of Austin's sexual relations with Ruth.[5] Theories of negligent hire and failure to protect were presented as well as battery as to Austin, and vicarious liability for Austin's acts. After much discovery and motion practice a trial was set for November 1, 2004.

In August 2004 Orebaugh moved to add Friedman as a party to the case.[6] The superior court denied this motion on timeliness grounds, but later granted a renewed motion to amend. As a condition of granting this motion, the superior court ruled that Orebaugh and Red Oaks would be responsible for fifty percent of plaintiff's attorney's fees and costs until "three days before the next scheduled trial date."

Before the start of trial, the superior court made a number of rulings regarding the evidence that would be used at trial. The court denied plaintiff's motion to exclude evidence of Ruth's sexual history. The court stated that

> [t]his order is not intended to preclude the plaintiff from raising any appropriate evidentiary objection at trial with respect to specific questions. Plaintiff may request a hearing on this issue outside of the presence of the jury before opening or before a particular witness testifies, so that the scope of questioning on this topic can be clarified outside the presence of the jury.

The court also ruled on Red Oaks's global motion in limine as follows:

> The following testimony, exhibits, and/or commentary in front of the jury is excluded:
>
> 1. That Gary Austin may have made sexual contact with Cindy York, irrespective of whether this contact is referred to as "sexual harassment." The evidence would have limited relevance apart from propensity, which is somewhat attenuated in any event, and should be excluded under [Evidence Rule] 403.
>
> 2. That Mr. Austin may have had sexual contact or inappropriate sexual conduct towards other residents. Evidence Rule 404(b). However, the court may permit evidence of such allegations to the extent that such allegations were communicated to Red Oaks or Parkside before Mr. Austin left the facility, but no reference shall be made to any such allegations until such proposed evidence is first presented outside of the presence of the jury.
>
> 3. That Gary Austin did or was rumored to have brought a pornographic video to a previous place of employment. Evidence Rules 404(b), 403.
>
> 4. That Gary Austin was or was rumored to have been at a previous place of employment under the influence of alcohol. Evidence Rules 404(b), 403.
>
> 5. That Ms. York believed that Gary Austin did not complete his assigned

---

**5.** The suit was initially brought in Ruth's name. It was later ratified by her conservator and at some point the conservator was substituted for Ruth as the named plaintiff.

**6.** Red Oaks later joined in the motion.

duties while employed at Red Oaks' assisted living home or a prior assisted living home. Evidence Rules 404(b), 403.

In response to plaintiff's motion to reconsider, the superior court reversed in part its decision to exclude evidence of Austin's sexual or sexualized conduct toward other residents and employees. The court stated:

> The court grants the motion to reconsider with respect to Gary Austin's sexual or sexualized conduct toward other residents and fellow employees to the extent that there is evidence that such conduct was made known to the Reeves and Red Oaks Assisted Living. It is relevant to show notice of such behavior. It is not admissible to establish that Mr. Austin engaged in sexual behavior with Ms. Ayuluk.

The superior court also limited the testimony from two of plaintiff's proposed expert witnesses—Tina DeLapp and Suzan Armstrong. DeLapp was a former member of the Alaska Board of Nursing, the board that regulates CNAs. Armstrong was a former deputy ombudsman for the Office of the Long Term Care Ombudsman. With respect to DeLapp, the superior court ordered in part that "DeLapp shall not be allowed to testify on the standards of care applicable to assisted living homes and its employees as she is not qualified or experienced in this area." With respect to Armstrong, the superior court ordered that:

> 1. Suzan Armstrong is not qualified to offer expert opinions on assisted living homes or what DHSS or prosecutors should have done, nor should her former role as ombudsman be employed to qualify her to give opinions in active litigation;
>
> 2. Defendants do not have access to the basis for Suzan Armstrong's opinions because of confidentiality issues and therefore are denied meaningful cross-examination of Armstrong, rendering her opinions, which in any way rely upon such foundation, inadmissible;
>
> 3. Suzan Armstrong is not qualified to make expert opinions on hiring practices, sexual relationship damages, the ability of

a person to consent to sexual relations and/or indicators of "sexual predators;"

> 4. Suzan Armstrong's assumptions of a duty to keep Ruth "safe" misstate Alaska law and are excluded as improper testimony;
>
> 5. Suzan Armstrong's opinions on the under-regulation of assisted living homes, her opinions on what the Reeves' "knew or should have known," or what risks were "foreseeable" will not assist the jury and are inadmissible under Alaska Evid. R. 403.
>
> 6. Suzan Armstrong's assumptions that "professional" standards apply misstates Alaska law. All testimony that a professional standard of care applies is excluded as contrary to Alaska law and improper, misleading testimony.

Trial began on September 11, 2006. At the close of the plaintiff's case, the court granted Orebaugh's motion for directed verdict as to the claims against her. The jury found that Ruth was mentally capable of consenting to sexual contact, but that there had been ten acts of nonconsensual sexual contact. Based on those ten acts, the jury found Austin liable for sexual battery. Red Oaks was found not negligent and not legally responsible for Austin's actions. Jill Friedman was found to have been negligent, but not to have caused Ruth's injuries. The jury awarded a total of $1,000 in compensatory damages and $6,500 in punitive damages. Both awards ran exclusively against Austin.

On appeal, plaintiff challenges a number of the superior court's rulings excluding evidence, the grant of Orebaugh's motion for directed verdict, and several jury instructions. Red Oaks challenges a discovery order and together with Orebaugh challenges the fee and cost-sharing order.[7]

## III. DISCUSSION

### A. It Was Error To Exclude Testimony from Tina DeLapp and Suzan Armstrong on Applicable Standards of Care.

One major issue in this case was whether Red Oaks and Austin breached a duty of care

---

7. Red Oaks also initially appealed the ratification of the lawsuit by Ruth's conservators as untimely, but withdrew this argument in its reply brief.

owed to Ruth. The threshold question, of course, was what duty of care was owed. Plaintiff argues that the superior court improperly excluded testimony from two witnesses who would have testified about the standard of care applicable to CNAs and assisted living home operators. Red Oaks responds that this testimony was properly excluded because the witnesses were not qualified as experts and their testimony was not relevant. For the reasons discussed below, we hold that excluding their testimony on the applicable standards of care was error.

█ We review a trial court's decision to admit or exclude expert testimony under an abuse of discretion standard.[8] When the admissibility of expert testimony turns on a question of law, we apply our independent judgment.[9]

Plaintiff argues that Tina DeLapp was qualified to testify about the standard of care governing CNAs such as Austin. The superior court ruled that DeLapp lacked the qualifications needed to testify on the standards of care applicable to assisted living homes and their employees. Red Oaks supports the superior court's position. It also argues that the duty of care of a CNA was not applicable, because Austin was not working as a CNA.

█ Alaska Evidence Rule 702(c) was added to the evidence rules by the legislature. It provides that in an action based on professional negligence, "a person may not testify as an expert witness on the issue of the appropriate standard of care except as provided in AS 09.20.185." Alaska Statute

09.20.185 provides that a licensed, trained, and experienced professional who is board certified "in an area directly related to the matter at issue" may testify on the issue of the appropriate standard of care.[10] DeLapp met these criteria with respect to nurses and CNAs. She had been a registered nurse for almost forty years and served from 1989 to 1992 on the Alaska Board of Nursing, the board that regulates CNAs.

Based on this expertise, she was going to testify that certification as a nursing assistant is a credential that imposes on the holder a duty to behave professionally in all situations in which he is in a caregiver role with a client, regardless of whether his current position requires that certification. She also would have testified that any sexual contact between a CNA and a client under his care and protection constitutes sexual misconduct. DeLapp was clearly qualified to speak about the duty of care applicable to a CNA, even a CNA working in a non-CNA caregiver role.[11]

█ Red Oaks argues that even if DeLapp was qualified, her testimony was not relevant. Evidence Rule 702(a) provides that if

> specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise.

Red Oaks argues that DeLapp's expert testimony would not assist the trier of fact because everyone agreed that what Austin did was wrong. However, establishing that Aus-

---

**8.** *Marron v. Stromstad,* 123 P.3d 992, 998 (Alaska 2005).

**9.** *Id.*

**10.** AS 09.20.185 provides:
 (a) In an action based on professional negligence, a person may not testify as an expert witness on the issue of the appropriate standard of care unless the witness is
 (1) a professional who is licensed in this state or in another state or country;
 (2) trained and experienced in the same discipline or school of practice as the defendant or in an area directly related to a matter at issue; and
 (3) certified by a board recognized by the state as having acknowledged expertise and

training directly related to the particular field or matter at issue.
 (b) The provisions of (a) of this section do not apply if the state has not recognized a board that has certified the witness in the particular field or matter at issue.

**11.** The superior court also held that DeLapp was not qualified to offer expert opinions on either mental health issues or severe emotional damages of a person whom she has not examined or the hiring, firing, or supervision of assisted living facility employees. She was also precluded from testifying on "the foreseeability of a sexual relationship or sexual action of Gary Austin." Plaintiff does not appeal these portions of the superior court's order.

tin's behavior was wrong was not the only purpose of DeLapp's testimony. Rather, the testimony was also relevant to show that Austin breached a duty of care when he engaged in the behavior in question. Because DeLapp's testimony was likely to "assist the trier of fact" in determining whether Austin breached his duty of care, we hold that the superior court abused its discretion in excluding her testimony.

▐ Similarly, plaintiff argues that Suzan Armstrong was qualified to testify about Red Oaks's standard of care regarding supervision of Austin and about the regulations concerning sexual contact between assisted living home caregivers and residents. The superior court ruled that Armstrong was not qualified to offer expert opinions on assisted living homes. Armstrong was a former deputy ombudsman for the Office of the Long Term Care Ombudsman (OLTCO). OLTCO's mission was to investigate complaints made "by or on behalf of an older Alaskan who resides in a long term care facility...."[12] Long term care facilities include both assisted living homes and nursing homes.[13] The majority of Armstrong's experience involved investigating complaints concerned with assisted living homes. While Alaska law states that the ombudsman only investigates complaints made by or on behalf of older Alaskans, OLTCO receives significant federal funding and this funding is also used to investigate complaints concerning younger persons in long term care if the complaint has any potential impact on older residents. Armstrong was thus qualified to testify to the standard of care that assisted living homes should meet with respect to supervision of caregivers and sexual contact between caregivers and residents.[14]

▐ As with DeLapp's testimony, Red Oaks argues that Armstrong's testimony would not assist the trier of fact because Red Oaks did not condone romantic or sexual relationships between residents and employees. However, the purpose of Armstrong's testimony was not merely to show that such sexual contact should not be condoned by assisted living homes; it was also relevant to the question whether Red Oaks breached a duty of care in supervising Austin.

Based on her expertise, Armstrong was going to testify that sexual predators working in long term care facilities often display a number of traits, including: "a caregiver being overly affectionate with residents or staff, residents reporting a 'crush' or interest in a caregiver, the caregiver's willingness to work undesirable graveyard shifts, and the caregiver professing that they can handle the home and its residents without any other assistance or supervision." She also would have testified that "[a]t the very least, a prudent administrator should ascertain through supervision and communication with residents and other staff, that no harm is occurring during this caregiver's unsupervised shift." More generally, Armstrong's proposed testimony was that the best way to minimize the risk of abuse of long term care residents is to take preventive actions, including effective hiring and screening of employees, adequate staffing patterns and staffing supervision, education of staff and residents on recognizing and reporting abuse, and vigilance on the part of administrators.

Taken together, Armstrong's testimony would have been relevant to the question of what behaviors a prudent assisted living home administrator should be alert to and the actions that should be taken to minimize

12. AS 47.62.015(a).

13. AS 47.62.090(2).

14. The superior court also excluded Armstrong's testimony on the grounds that the defense did not have access to the basis for her opinions because of confidentiality issues, thus denying Red Oaks the opportunity for meaningful cross-examination. While OLTCO cannot release confidential records, reports of investigations are considered public documents and are regularly released to the public. The availability of these reports provides Red Oaks with a sufficient basis for conducting cross-examination. As plaintiff points out, expert testimony from physicians, psychologists, and lawyers is often based on the treatment of other patients or clients whose records are confidential. Members of these groups are often qualified as expert witnesses, and the law does not prevent them from being called as expert witnesses. It was error to bar Armstrong's testimony on this ground.

the risk of sexual abuse of residents by staff members. Because Armstrong's testimony was likely to "assist the trier of fact" in determining whether Red Oaks breached its duty of care, it was an abuse of discretion to exclude her testimony.

### B. It Was Error To Exclude Evidence that Red Oaks and Orebaugh Knew Austin Posed a Risk to the Female Residents of Red Oaks.

■ Plaintiff argues that the superior court improperly excluded certain evidence that plaintiff contends showed that Red Oaks should have known Austin posed a risk to female residents of Red Oaks. Red Oaks counters that the superior court's exclusion of the evidence was proper because the evidence was not probative but was prejudicial and tangential. We conclude that it was error to exclude evidence pertaining to the bruising of a Red Oaks resident and to the rumors of Austin watching a pornographic video at another assisted living home where he worked.

■ We review a trial court's decisions on the admissibility of evidence for abuse of discretion.[15] However, whether the superior court applied the correct legal standard is a question of law to which we apply our independent judgment.[16]

Before trial, the superior court ruled that evidence could not be presented to the jury concerning Austin bringing a pornographic video to a previous place of employment or having once been under the influence of alcohol there. The superior court made these rulings based on Alaska Evidence Rules 404(b) and 403. At trial, the superior court ruled that plaintiff could not introduce evidence pertaining to bruises found on a resident at Red Oaks shortly after Austin's shift had ended.

Evidence Rule 404(b)(1) prohibits admitting evidence pertaining to other crimes, wrongs, or acts if "the sole purpose for offering the evidence is to prove the character of a person in order to show that the person acted in conformity therewith. It is, however, admissible for other purposes, including, but not limited to, proof of . . . knowledge[.]" Contrary to plaintiff's argument, the risk of improper "propensity evidence" was not eliminated simply because all parties agreed that Austin had sex with Ruth. While the parties agreed that Austin and Ruth engaged in sexual activity, the nature of that activity was contested. Plaintiff maintained that the sexual encounters constituted sexual abuse and assault. Austin and Red Oaks maintained that the sexual encounters were consensual. Thus, the risk existed that the contested evidence could be used to show that Austin's behavior was abusive and assaultive, in conformity with the character revealed by the excluded evidence. Because the evidence could be viewed as propensity evidence, the superior court was correct in its decision to apply Evidence Rule 404(b) in determining whether the evidence was admissible.

While Evidence Rule 404(b) applies, it was an abuse of discretion to exclude items of evidence that were admissible for the purpose of demonstrating knowledge on the part of Red Oaks. Plaintiff's claims against Red Oaks for negligent hiring, training, supervision, and retention required proof that Red Oaks knew or should have known Austin posed a risk to the residents. Evidence is only admissible for the purpose of demonstrating knowledge if it would have shown that the "employer knew or should have known of the employee's propensity for the conduct which caused the injury."[17] Thus, only evidence that would have alerted Red Oaks that Austin posed a risk of sexual misconduct with residents should have been admitted.[18]

---

**15.** *Landers v. Municipality of Anchorage,* 915 P.2d 614, 616 n. 1 (Alaska 1996).

**16.** *Id.*

**17.** *Estevez–Yalcin v. Children's Vill.,* 331 F.Supp.2d 170, 174 (S.D.N.Y.2004) (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn,*

229 A.D.2d 159, 654 N.Y.S.2d 791, 793–94 (1997)).

**18.** The superior court allowed evidence of Austin's sexualized conduct toward other residents and fellow employees to be admitted to the extent that such conduct was made known to Red Oaks because it was relevant to show notice of the risk of such behavior.

The evidence pertaining to the alcohol rumors and the assertions of Austin's poor job performance could properly be excluded under this standard. However, the evidence pertaining to the pornographic video and the bruises found on a resident shortly after Austin's shift had ended should have been admitted. The bruising could reasonably have been caused by sexual contact of some sort. Viewing pornography on the job is also conduct that could reasonably alert supervisors of the need for further inquiry and supervision.

Red Oaks argues, citing a South Dakota opinion, that the connection between "possession of pornographic materials and an individual's propensity to commit sexual offenses is tenuous, if not nonexistent." [19] We think that in the context of an assisted living home where the opportunities for sexual abuse of residents by caregivers are pronounced, the fact that a caregiver may be viewing pornography on the job could reasonably be regarded as a danger sign requiring action on the part of home administrators. As a result, we conclude that it was an abuse of discretion to exclude the evidence pertaining to the pornographic video as well as the evidence of bruises found on a resident.

Red Oaks contends that the superior court properly excluded the evidence in question under Evidence Rule 403 to prevent a mini-trial on the truth of the proposed evidence. But the evidence was offered against Red Oaks to show knowledge on the part of Red Oaks rather than conduct by Austin. A limiting instruction could have explained this point. In any event, no mini-trial was needed as to whether the claims were true or false.

## C. It Was Error To Exclude Evidence that Austin Made Sexual Advances Toward Other Residents of Red Oaks.

■ The superior court excluded evidence that Austin acted in a sexually inappropriate way toward other residents at Red Oaks.[20] The court made its ruling based on the bar on propensity evidence contained in Evidence Rule 404(b)(1). But the evidence was offered for impeachment purposes, a use not prohibited by Rule 404(b)(1).

Austin testified that he loved Ruth.[21] Testimony of advances that Austin made toward other residents could reasonably cast doubt on the credibility of this assertion. While it is possible for a man in love with a woman to make sexual advances toward other women, the jury was entitled to evaluate Austin's credibility with respect to his declaration of love for Ruth in light of contemporaneous sexual advances he made toward other residents.

## D. The Superior Court Properly Admitted Evidence of Ruth's Sexual History.

■ Plaintiff argues that the superior court erred by admitting evidence of Ruth's prior sexual history.[22] Red Oaks responds that the evidence was properly admitted because it was relevant to the issues of consent,

---

**19.** *State v. White,* 549 N.W.2d 676, 682 (S.D. 1996).

**20.** Plaintiff does not show that Red Oaks knew or should have known about this conduct prior to Ruth's sexual contact with Austin. Therefore, this evidence was not admissible for the purpose of showing knowledge by Red Oaks.

**21.** In response to questioning, Austin testified in part as follows:

Q. How did you feel about Ruth?
A. Feelings developed over time. We had a quiet time together that was better than anything I'd ever experienced before just in ... holding each other....
....
Q. Did you care about her?
A. Yes.

Q. Did you love her?
A. Yes, I did.

**22.** The superior court denied plaintiff's motion in limine to exclude evidence of Ruth's sexual history, but the order permitted plaintiff to make evidentiary objections by asking for a hearing before any particular witness was called to make sure that the scope of questioning was appropriate. Plaintiff made a motion to reconsider before the start of trial, but the superior court denied the motion. Red Oaks did not call any witnesses in its defense, deciding to only play part of Ruth's deposition instead. To the extent that Ruth's sexual history was entered into the record, it was during examination and cross-examination of plaintiff's witnesses.

damages, and impeachment. We think that Red Oaks has the better of this argument.

 Ruth's prior sexual history was relevant to the extent that it illuminated her mental capacity to consent to sexual contact. "A person's capacity to understand something ... is a factual issue for the jury and, like other facts, may properly be established by circumstantial evidence." [23] In determining whether a person has the mental capacity to consent to sex, "[a] victim's mere understanding of the physical act of sex is not equivalent to an appreciation of the nature and consequences of the victim's conduct[.]" [24] "To appreciate the nature and consequences of engaging in an act of sexual penetration, the victim must have the capacity to understand the full range of ordinary and foreseeable social, medical, and practical consequences that the act entails[.]" [25]

Plaintiff's expert testified that in his opinion Ruth had "significantly diminished capacity to exercise consent in relationships where other variables are at play, other variables primarily involving differential power relationship[s] between her and the other person, differential levels of intellectual and cognitive competence between her and the other person." But he stated that her brain injury did "not automatically mean that she did not have the capacity for consent, for a romantic and sexual relationship." The testimony introduced by Red Oaks regarding Ruth's sexual history touched on birth control, pregnancy, and other sexual relationships. While very little of this evidence directly pertained to Ruth's capacity to consent, it was circumstantial proof that Ruth understood the "nature and consequences" of engaging in sexual conduct. The jury could have relied on this evidence to support its conclusion that Ruth

had the capacity to consent to sexual contact.[26]

### E. The Superior Court Did Not Err in Granting Orebaugh's Motion for Directed Verdict.

 Plaintiff argues that the superior court erred in granting Orebaugh's motion for a directed verdict. Orebaugh responds that the directed verdict was appropriate because no evidence justified holding her liable. We agree that the directed verdict was appropriate.[27]

The only two grounds that might support liability against Orebaugh were based on (1) her duty as designated administrator for Red Oaks, and (2) her alleged recommendation of Austin to Red Oaks.

With respect to Orebaugh's duty as designated administrator, the evidence indicated that when Orebaugh was acting as such, Cindy York reported to her that Austin was sexually harassing her. Orebaugh initially indicated that she would talk to Austin at her next opportunity, but later decided that she would leave the situation to the Reeveses. However, Orebaugh did ensure that York and Austin did not work together until the Reeveses returned. Orebaugh also contacted legal counsel who mentioned the importance of having a sexual harassment policy. Orebaugh wrote a memo to Susan Reeves detailing this information and upon the Reeveses' return Orebaugh informed them of York's report and gave them the memo that she had drafted.

We fail to see how Orebaugh's conduct in this respect could serve as the basis for liability. An administrator designee acts as a substitute for the administrator during the administrator's absence.[28] If immediate ac-

---

**23.** *Jackson v. State*, 890 P.2d 587, 592 (Alaska App.1995).

**24.** *Id.* at 591.

**25.** *Id.* at 592.

**26.** Plaintiff also argues that Ruth's sexual history should have been excluded under Evidence Rule 403 because it encouraged the jury to view her in a bad light. In view of the importance of the issue of Ruth's capacity to consent to sex, we are

unable to say that the superior court abused its discretion in finding the evidence more probative than prejudicial.

**27.** When reviewing such motions, this court determines whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment. *Alaska Marine Pilots v. Hendsch*, 950 P.2d 98, 108 (Alaska 1997).

**28.** 7 AAC 75.210(a)(2).

tion is called for during the administrator's absence, the administrator designee is expected to take it. Here, however, no action beyond that which Orebaugh took would seem to be reasonably required. When she passed on the relevant information to the Reeveses, Orebaugh, as the designated administrator, met her legal obligations.

Similarly, Orebaugh informed Susan Reeves that Austin was available for work. We assume for purposes of deciding whether the directed verdict was warranted that this was a recommendation. But it was undisputed that Orebaugh also passed on negative rumors regarding pornography she had heard about Austin. When Orebaugh gave the Reeveses this information she discharged any responsibility she may have had.[29] The

---

**29.** There is a question whether Orebaugh told Reeves of the rumors regarding Austin drinking at his prior place of employment. *See supra* note 4. Reeves may have gotten this information only from York, but the important point is that Reeves had the information and hired Austin anyway. Thus any oversight on the part of Orebaugh in failing to pass on the information regarding the rumor of alcohol use could not serve as a basis for imposing liability on her.

**30.** The correctness of jury instructions is reviewed de novo. *Parnell v. Peak Oilfield Serv.,* 174 P.3d 757 (Alaska 2007):

> An instruction that sets out an incorrect or incomplete statement of the applicable law amounts to reversible error only if it causes substantial prejudice to a party—that is, only "if it can be said that the verdict may have been different had the erroneous instruction not been given." When "evaluating whether there has been prejudicial error with regard to jury instructions, the reviewing court must put itself in the position of the jurors and determine whether the error probably affected their judgment."

*Id.* at 765 (citations omitted).

**31.** Jury Instruction No. 33 provided:

> Under certain circumstances, an employer may be legally responsible for the acts of its employee. I[n] order to determine whether Susan and Richard Reeves d/b/a Red Oaks Assisted Living are legally responsible for the acts of Gary Austin, you must decide that it is more likely true than not true that he was acting within the course and scope of his employment. In order to determine whether he was acting within the course and scope of his employment, you may consider the following factors:

---

decision to hire Austin rested with the Reeveses, not with Orebaugh.

## F. Jury Instruction Issues

 Plaintiff challenges four of the jury instructions that were given. In the paragraphs that follow we discuss each of the challenges.[30]

### 1. Jury Instruction No. 33

Jury Instruction No. 33 was a vicarious liability instruction.[31] Plaintiff contends that Red Oaks could have been found vicariously liable on either of two legal theories. First, vicarious liability could have been found if Austin's conduct was within the scope of his employment by Red Oaks. Second, plaintiff claims that even if Austin was acting outside

> (1) whether Gary Austin's acts were of a kind that he was employed to perform;
> (2) whether Gary Austin's acts occurred substantially within the authorized time and space limits of employment;
> (3) whether Gary Austin's acts were motivated, at least in part, by a purpose to serve Susan and Richard Reeves d/b/a Red Oaks Assisted Living;
> (4) whether Gary Austin's intentional acts [were] of the type and nature that [were] not unexpected by Susan and Richard Reeves d/b/a Red Oaks Assisted Living;
> (5) whether the acts of Gary Austin were the kind or similar to the kind requested by Susan and Richard Reeves d/b/a Red Oaks Assisted Living;
> (6) whether the purpose of Gary Austin's acts were to serve Susan and Richard Reeves d/b/a Red Oaks Assisted Living, not his own benefit;
> (7) whether the acts of Gary Austin did in fact serve Susan and Richard Reeves d/b/a Red Oaks Assisted Living;
> (8) whether the acts of Gary Austin were similar to other acts authorized by Susan and Richard Reeves d/b/a Red Oaks Assisted Living or reasonably related to other acts authorized by Susan and Richard Reeves d/b/a Red Oaks Assisted Living;
> (9) whether the acts of Gary Austin were reasonably necessary to accomplish something that Susan and Richard Reeves d/b/a Red Oaks Assisted Living requested or required;
> (10) whether the acts of Gary Austin were of the type that Susan and Richard Reeves d/b/a/ Red Oaks Assisted Living reasonably should have expected in the performance of his duties to Susan and Richard Reeves d/b/a Red Oaks Assisted Living;
> (11) whether Gary Austin was able to engage in acts with Ruth Ayuluk because of authority,

the scope of his employment Red Oaks could have been liable under the "aided-in-agency" theory. Plaintiff claims that Jury Instruction No. 33 incorrectly combined these two theories. The first ten listed factors in the instruction are appropriate to a scope of employment determination. But plaintiff contends that the eleventh factor, "whether Gary Austin was able to engage in acts with Ruth Ayuluk because of authority, power, or access he had due to his employment at Red Oaks," should have been the subject of a separate instruction under which vicarious liability could have been found even if Austin was acting outside the scope of his employment.[32]

Red Oaks responds that any error in melding the two theories was harmless because the aided-in-agency theory was not applicable under the facts of this case and no instruction on it should have been given.

In *Veco, Inc. v. Rosebrock* we approved jury instructions that permitted a jury to impose vicarious liability on an employer for the sexual harassment of an employee by a supervisor under an aided-in-agency theory.[33] We applied the Restatement (Second) of Agency section 219(2)(d), which provides:

> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
> . . . .
>
> (d) the servant purported to act or speak on behalf of the principal and there was reliance on apparent authority, *or he was aided in accomplishing the tort by the existence of the agency relation.*[34]

We determined that the aided-in-agency theory should apply because "[h]arassment by supervisors is facilitated, made more serious, and is less apt to be reported because supervisors are 'understood to be clothed with the employer's authority.' "[35]

Red Oaks argues that the aided-in-agency rule should only apply in cases in which the victim is "given to understand that the servant is acting within his role as agent." Red

---

power, or access he had due to his employment at Red Oaks.

**32.** Plaintiff's proposed aided-in-agency instruction stated: (Proposed No. 46)

> I will now instruct you how to determine if Red Oaks is legally responsible for the actions of Gary Austin. Under the law, the fact that Gary Austin's actions may have been intentional, criminal or sexual in nature does not absolve Red Oaks from legal responsibility for those actions. Furthermore, the fact that Gary Austin's actions may have been specifically prohibited by Red Oaks also does not absolve Red Oaks from legal responsibility for those actions. The law provides that Red Oaks is legally responsible for Gary Austin's actions if Gary Austin was aided in engaging in his sexual contacts with Ruth by his employment within Red Oaks.
>
> There are several factors you may consider in determining whether Austin's sexual contact with Ruth was made possible or facilitated by the existence of the employment relationship between Gary Austin and Red Oaks and the Reeves:
>
> 1. Did Gary Austin's employment relationship with Red Oaks and Reeves provide him with special access to Ruth?
> 2. Did that special access enable Gary Austin to engage in a sexual contact with Ruth?
> 3. Did Gary Austin's employment relationship with Red Oaks and Reeves provide Austin with the ability and opportunity to conceal his sexual contact with Ruth?
> 4. Did Gary Austin's employment relationship with Red Oaks and Reeves provide Austin with authority over Ruth?
> 5. Was Ruth aware of that authority?
> 6. Did that authority aid or enable Austin to initiate and continue his sexual contact with Ruth?
>
> These facts are again merely guidelines for your consideration. It is not necessary that every one be present for Gary Austin's sexual contact with Ruth to have been made possible or facilitated by the existence of the employment relationship between Gary Austin and Red Oaks. Furthermore, you are not to focus solely on the sexual acts between Gary Austin and Ruth. In determining whether Gary Austin's sexual contact with Ruth was made possible or facilitated by the existence of the employment relationship between Gary Austin and Red Oaks you are to consider the sexual acts as well as his conduct related to or leading up to those acts. You are to consider the totality of the circumstances, taking into account all of Gary Austin's actions, to determine if Gary Austin's sexual contact with Ruth was made possible or facilitated by the existence of the employment relationship between Gary Austin and Red Oaks.

**33.** 970 P.2d 906, 914 (Alaska 1999).

**34.** *Id.* at 914 (emphasis added in *Veco* ).

**35.** *Id.* (quoting *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 76–77, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (Marshall, J., concurring.).

Oaks argues that Ruth had no such understanding in this case, noting that Ruth understood that she needed to keep her romantic and sexual interests in Austin secret from Red Oaks.[36] In support of this argument Red Oaks refers us to *Zsigo v. Hurley Medical Center*.[37] The court in *Zsigo* declined to apply the aided-in-agency theory to a case where a nursing assistant sexually assaulted a hospital patient. The Michigan court was concerned that the aided-in-agency theory risked eliminating the general rule that employers are only liable for acts of employees committed within the scope of their employment.[38] The court suggested that if the rule had any legitimate application it should be limited to cases of sexual harassment of an employee by a supervisor.[39]

▮▮▮▮▮ There is considerable weight to the concerns expressed by the Michigan court that aided-in-agency as a theory independent of apparent authority risks an unjustified expansion of employer tort liability for acts of employees.[40] Given these concerns, we believe that the aided-in-agency theory as a separate basis for vicarious liability outside of the employment supervisory context should be limited to cases where an employee has by reason of his employment substantial power or authority to control important elements of a vulnerable tort victim's life or livelihood. Whether a particular type of case falls within this category should be a question for the court, not a jury.[41] We believe that an instruction on the theory should have been given in this case.

In *Veco* we held that "an employer is vicariously liable for a hostile work environment created by its supervisors ... regardless of whether the supervisors were acting within the scope of their employment." [42] We noted that although the acts of harassment were outside the scope of employment, the power to accomplish the unauthorized acts was a product of the supervisors' employment relationship:

> [H]arassment by a supervisor carries an implied threat that the supervisor will punish resistance through exercising supervisory powers, which may range from discharge to assignment of work, particularly exacting scrutiny, or refusal to protect the employee from coworker harassment.... Although coworkers or even outsiders may also be capable of creating a sexually harassing work environment, *it is the authority conferred upon a supervisor by the employer that makes the supervisor particularly able to force subordinates to submit to sexual harassment.*[43]

36. Ruth testified: "He wanted it to be a secret ... [t]elling me not to tell no one because he didn't want to get fired too soon." Ruth also testified: "I knew that he was using me, but I was like—if he is going to use me, I might as well go for it because ... he is going to get caught one of these days."

37. 475 Mich. 215, 716 N.W.2d 220 (2006).

38. *Id.* at 226.

39. *See id.* at 227. *Veco, Inc. v. Rosebrock*, 970 P.2d 906 (Alaska 1999), was cited by the Michigan court in this connection. *See Zsigo*, 716 N.W.2d at 227 n. 28.

40. We note for example that the Restatement (Third) of Agency (2006) no longer endorses an aided-in-agency theory when an agent is not acting with apparent authority. *See* Restatement (Third) of Agency § 7.08 cmt. b (2006).

41. For example, the Vermont Supreme Court has considered the question in at least two contexts, first in *Doe v. Forrest*, 176 Vt. 476, 853 A.2d 48, 55–69 (2004) (reversing a grant of summary judgment because the aided-in-agency theory could apply to county sheriff's department whose deputy coerced sex from a store clerk and emphasizing the significance of law enforcement officers' power over others, their unique access to others as protectors of citizens, and employers' best position to prevent misconduct), and more recently in *Doe v. Newbury Bible Church*, 182 Vt. 174, 933 A.2d 196 (2007) (deciding in answering certified question in federal diversity action that the aided-in-agency theory does not extend to church and nonresidential school whose pastor abused a young student and distinguishing *Forrest* because, among other reasons, police have greater power over citizens than a pastor has over children). *See also Hardwicke v. Am. Boychoir Sch.*, 188 N.J. 69, 902 A.2d 900, 903–04, 918–20 (2006) (reversing a trial court's dismissal of claim against residential school of sexual abuse of child by resident teacher in part because aided-in-agency theory applied).

42. *Veco*, 970 P.2d at 914.

43. *Id.* (quoting *College–Town v. Mass. Comm'n Against Discrimination*, 400 Mass. 156, 508

In *Veco* we did not suggest that an employer could be vicariously liable for an employee's torts committed outside the scope of employment merely because the employee's position gave the employee access or proximity to the victim. Instead what is needed, as we explained, is a relationship with authority or control over the victim. We stated:

> [A] supervisor who does not oversee the complainant should be treated as a co-worker. In that situation, the supervisor does not have authority over the complainant and may not be aided by his position in the workplace. Furthermore, when a co-worker or supervisor with no control over the complainant creates a hostile environment, the complainant should be less hesitant to report the situation, since the harasser could not retaliate by changing the conditions of the complainant's employment.[44]

We believe that a caregiver in an assisted living home who has supervisory power or authority over vulnerable residents is, for purposes of the aided-in-agency theory, in a position that is analogous to that of a supervisor of employees. A caregiver, as a provider of food, comfort, hygiene, and medication for residents, has the power to withhold or delay any of these basic needs. Thus, like the supervisor of employees, a caregiver is in a position to punish in direct or subtle ways a resident who resists sexual advances. While the sexual advances themselves may neither be authorized nor reasonably appear to be authorized by the employer, the caregiver's power that enables him to further his improper conduct is an inherent part of the employment relationship.[45]

In the present case there is ample evidence that Red Oaks placed Austin in a position of power and authority over Ruth.

The trial testimony of Cynthia Patricia Gurisko, an employee at Red Oaks, was as follows with respect to Austin's responsibilities:

Q: And what was it that your role was going to be at the home, at Red Oaks?

A: I was told that I was going to be the primary care giver. I was solo shift during the day. It was a lot of responsibility. I was responsible for all of the care of the—of the residents throughout my entire shift.

. . . .

Q: What was you[r] understanding of his [Gary Austin's] position?

A: I was informed that he would have the mirror position of mine. He would at first start out on the weekends and then later progress to the evenings. And his responsibilities were supposed to be the same as mine, just on a different shift.

Another Red Oaks employee, Cynthia York, stated that "on the weekends Gary [Austin] would come in and he would be alone with the—with the entire household of residents um, completely unsupervised."

We conclude that plaintiff was entitled to an instruction permitting the imposition of vicarious liability on Red Oaks under an aided-in-agency theory. Instruction No. 33 did not suffice for that purpose because it did not recognize aided-in-agency vicarious liability separate from vicarious liability that may exist because the tort of an employee is within the course and scope of his employment. Accordingly, in the new trial that is required by this opinion, the jury should be given an appropriate aided-in-agency instruction. Although we will not undertake to draft a model instruction for the court, the key determinations for the jury to make are (1) whether Austin by reason of his employ-

---

N.E.2d 587, 593 (1987)) (emphasis added in *Veco* ).

**44.** *Id.* at 915 (citation omitted).

**45.** As one of the expert witnesses on assisted living homes testified in this case:

> A: . . . . If you're an employee and you're in a position of power and you're in a position of control and the person that you're working

> with needs you to be able to help them live their life and live the quality of life that they are hoping to live, than that's all necessary.

> Q: From your perspective as an administrator does it matter the degree of impairment the client has as to whether or not sexual contact can occur?

> A: I—I think just by the virtue of the relationship of your being in control or your being in charge and you—the person needing you to fulfill their basic needs in life, no, there's never

ment with Red Oaks had substantial power or authority over Ruth's important needs and, if so, (2) whether that power and authority played a substantial role in bringing about the sexual contact between Austin and Ruth.

## 2. Jury Instruction No. 24

■■ Plaintiff argues that the superior court erred in giving Jury Instruction No. 24. This instruction was a pattern instruction stating that Austin was subject to the reasonable person standard. Plaintiff contends that since Austin was a CNA and there was evidence that he was serving as such in his employment with Red Oaks, an appropriate instruction would have held him to the standard of care of a CNA. The important point is that CNAs are prohibited by regulation from sexual contact with their clients.[46] Plaintiff sought an instruction that asked the jury to determine whether Austin was acting as a CNA and, if so, to determine whether Austin violated the regulations governing CNAs' conduct, and, if so, to find Austin negligent per se.[47]

Red Oaks argues that Instruction No. 24 was appropriate and the plaintiff's proposed instruction was properly not given because Austin was not working as a CNA. But there was evidence that showed that Austin applied for a CNA position, that he was hired because he was "highly certified," that he "over[saw] residents' daily lives" at Red Oaks, and that he believed his position was that of a CNA. Much of this evidence was

an instance where that sort of thing should be permitted in a facility and—and allowed to occur.

46. See 12 AAC 44.870(b)(18); 12 AAC 44.895(14).

47. The requested instruction read as follows: (Proposed No. 37A)

Plaintiff claims that Gary Austin was a Certified Nurse Aide and that he violated certain regulations and statutes that govern Certified Nurse Aides. The defendants claim that Gary Austin was not acting as a Certified Nurse Aide when he was employed by Red Oaks.

If you find that Gary Austin was employed as a Certified Nurse Aide while employed at Red Oaks, you must decide whether Gary Austin violated the following regulations and statutes. If you do not find that Gary Austin was employed as a Certified Nurse Aide while at Red Oaks, you should disregard the following regulations and statutes.

2 AAC 44.870. Unprofessional Conduct

Unprofessional conduct [of a certified nurse aide] includes conduct that could adversely affect the health and welfare of a client, including

. . .

(6) failing to respect a client's rights and dignity regardless of the client's social or economic status, the client's personal attributes, or nature of the client's health problems or disability;

(7) neglecting or abusing a client physically, emotionally, or verbally;

. . .

(18) engaging in sexual misconduct.

12 AAC 44.895(14). Definition of sexual misconduct.

"Sexual misconduct" means sexual conduct by a certified nurse aide involving a client, and includes

(A) behavior, gestures, or expressions that are seductive, sexually suggestive, or sexually demeaning to the client;

(B) engaging in, or attempting to engage in, sexual penetration with a client; "sexual penetration" has the meaning given in AS 11.81.900(b), as amended as of October 9, 1998, adopted by reference;

(C) engaging in or attempting to engage in, sexual contact with a client; "sexual contact" has the meaning given in AS 11.81.900(b), as amended as of October 1998, adopted by reference.

11.81.900(b)(55). Definition of sexual contact.

"Sexual contact" means

(A) the defendant's

(i) knowingly touching, directly or through clothing, the victim's genitals, anus, or female breast; or

(ii) knowingly causing the victim to touch, directly or through clothing, the defendant's or victim's genitals, anus, or female breast;

11.81.900(b)(56). Definition of sexual penetration.

"Sexual penetration" means

(A) genital intercourse, cunnilingus, fellatio, anal intercourse, or an intrusion, however slight, of an object or any part of a persons' body into the genital or anal opening of another's body;

. . .

(C) each party to any of the acts defined as "sexual penetration" is considered to be engaged in sexual penetration.

If you decide that it is more likely true than not true that Gary Austin violated any part of these statutes or regulations and that the violation was a legal cause of Ruth's injury, then you are required to find Gary Austin negligent per se. But if you find that Gary Austin did not violate any of these statutes or regulations, then you should decide whether Gary Austin is

disputed, but the dispute merely means that whether Austin was employed as a CNA while at Red Oaks was properly a jury question.

■ We believe that the court should have given an instruction along the lines of plaintiffs' proposed Instruction No. 37A. Further, in our view, the failure to give some such instruction was prejudicial because, assuming that Austin was acting as a CNA at Red Oaks, the instruction would have properly advised the jury that a CNA may not have sexual contact with a client even if it is consensual. Thus the jury could have found that every sexual act Austin committed, whether consented to by Ruth or not, could be the basis for an assessment of damages.

■ Plaintiff also claims that Instruction No. 24 was erroneous as it applied to Red Oaks. Plaintiff claims that Red Oaks's conduct should have been measured against that of a reasonably prudent assisted living home operator rather than the reasonable person standard employed by Instruction No. 24. Red Oaks argues however that Instruction No. 24 when read in conjunction with Instruction Nos. 25 and 26 cured this possible defect. Jury Instruction No. 25 states that "parties were required to use whatever knowledge, training, experience, skill, or intelligence they either possessed or claimed to possess" in meeting their duty of care. Instruction No. 26 provides excerpts from Alas-

ka statutes and regulations dealing with assisted living homes and states at the end that jury members "may consider [any violation of these statutes and regulations] along with all the other evidence in deciding whether under the circumstances of this case [Red Oaks] used reasonable care."

Read together, Instructions Nos. 24, 25, and 26 were sufficient to convey to the jury the point that Red Oaks should be held to the standard of care applicable to licensed assisted living homes. Thus, as to Red Oaks, the superior court did not err in giving Instruction No. 24 together with the two instructions that followed it.

### 3. Jury Instruction No. 31

■ Jury Instruction No. 31 told the jury that in order for plaintiff to prevail "[p]laintiff must establish that Ruth ... did not have the capacity to consent to sexual relations with ... Austin, or did not consent to sexual relations with ... Austin." The instruction went on to describe the circumstances under which a person might lack the capacity to consent to sexual relations.[48] Plaintiff contends that Instruction No. 31 was erroneous because even if Ruth was able to consent to sexual contact, any contact between her and Austin was a violation of Austin's standard of care as "both a caregiver and a CNA." Plaintiff also argues that Instruction No. 31 as to Red Oaks would have been inappropriate if

liable on the basis of Plaintiff's other claims for relief.

**48.** Jury Instruction No. 31 provided:

In order to prevail on any claim, Plaintiff must establish that Ruth Ayuluk did not have the capacity to consent to sexual relations with Gary Austin, or did not consent to sexual relations with Gary Austin. A person lacks the ability to consent to sexual relations if that person suffers from a mental condition that substantially prevents the person from being able to understand either the nature or consequences of engaging in sexual activity. If the person understands that he or she is engaging in intimate or personal sexual behavior which may have some effect or residual impact upon the person, upon the person's partner, or upon others, then the person may have the mental capacity to consent to sexual relations.

Below are some factors you may consider in determining whether a person has the capacity to consent to sexual relations:

(1) Whether the person knows that the conduct he or she is engaging in is distinctively sexual;

(2) Whether the person knows that he or she has the right and ability to engage in sexual activity;

(3) Whether the person knows that sexual intercourse may lead to pregnancy and child birth;

(4) The person's understanding of the use of birth control;

(5) The person's sexual experience, including the nature and extent of the person's sexual relations with others;

(6) The mere fact that a person engaged in sexual relations does not mean that the person has the mental capacity to consent to sexual relations.

Proof of general mental incapacity or retardation or IQ range or mental age of a victim does not necessarily prevent a person from being able to understand the nature and conse-

Armstrong and DeLapp had been allowed to testify that any sexual contact between Austin and Ruth regardless of consent violated assisted living home regulations.

Red Oaks argues that to the extent that Ruth was capable of consenting and did consent to sex with Austin, she suffered no wrong even if Austin and Red Oaks violated their respective duties.

We think that the plaintiff has the better of this argument. Even if Ruth was capable of consenting to sex and did consent to sex with Austin, tort damages for physical and mental harm suffered by Ruth could have been assessed. Assuming that the standard of care is that no sexual contact between staff and residents is permitted, regardless of the consent of a resident, that standard is imposed because of the vulnerability of residents and consent should not be a complete defense.[49]

#### 4. Instruction No. 30[50]

█ Plaintiff argues that the limitation in this instruction to "actual physical or mental injury" is improper. Plaintiff argues that "actual mental injury" would not include forms of mental distress such as humiliation or degradation. But considering the instructions taken as a whole, it is evident that Ruth's recoverable damages included many different forms of mental distress. Instruction No. 34 informed the jury that Ruth was claiming "emotional injury" and Instruction No. 35 broadly defined emotional injury to include "pain and emotional suffering, loss of enjoyment of life, humiliation, degradation, etc." We conclude therefore that there was no error in giving Instruction No. 30 when it is considered along with Instructions Nos. 34 and 35.

### G. Damages

█ Plaintiff's final claim that we discuss is that the jury's compensatory damage award cannot be utilized on remand because it was the product of the trial court's erroneous evidentiary and instructional rulings.[51] We agree that compensatory damages must be retried. Instruction No. 31 limited damages to unconsented sexual contacts. But, as we have held, the jury should have been permitted to assess damages for all of the sexual contacts between Austin and Ruth if the jury found that such contacts were in violation of Austin's or Red Oaks's standard of care. Further, testimony concerning the standards of care that governed Austin's and Red Oaks's conduct was erroneously excluded, and as to Austin, the jury was not correctly instructed as to the potentially applica-

quences of a sexual act, but it is a factor you may consider.

**49.** *Cf.* Restatement (Second) of Torts § 892C(2) & cmt. e (1979) ("If conduct is made criminal in order to protect a certain class of persons irrespective of their consent, the consent of members of that class to the conduct is not effective to bar a tort action."; "The legislative purpose to protect the plaintiff irrespective of his consent must be clear.... In making the determination as to the purpose, consideration will normally be given to the fact that ... there is a significant inequality between the situation of the party consenting and the party guilty of the conduct consented to. The necessary purpose will ordinarily be found when it is apparent that the statute is intended for the protection of a class of persons who, by reason of their immaturity, inexperience, or lack of judgment, are unable to protect themselves against the conduct to which they are likely to consent."); *see also Joseph v. State,* 26 P.3d 459, 473–74 (Alaska 2001) (holding that a "jailer's duty of reasonable care to protect a prisoner from unreasonable risks of harm encompasses reasonably foreseeable suicide attempts" and that the "intentionality of a prison-

er's suicide should not altogether excuse that duty").

Plaintiff takes issues with other aspects of Instruction No. 31 with respect to the test for capacity and the factors listed in the instruction. We think that Instruction No. 31 is not erroneous in these respects.

**50.** Jury Instruction No. 30 provides:

If you decide that Gary Austin improperly touched Ruth Ayuluk, you must then decide whether the improper touching caused Ruth Ayuluk any actual physical or mental injury, and if it did, you must decide the amount of money necessary to compensate Ruth Ayuluk for that injury.

If you decide Gary Austin improperly touched Ruth Ayuluk but that this did not cause Ruth Ayuluk any actual physical or mental injury, you may award Ruth Ayuluk nominal damages.

**51.** Plaintiff raises a number of minor points that we do not discuss because they are either moot or obviously lacking in merit.

ble standard of care.[52]

## H. Cross–Appeal

### 1. Medical release

On cross-appeal Red Oaks argues that if this case is remanded, Ruth, or her conservator, should be required to sign a medical release as part of the discovery process. Red Oaks notes that the trial court declined to require Ruth to sign a medical release because the court ruled that "she has not sought damages for any physical injuries and thus health care records in that regard should remain privileged as a general rule." Instead, the court required the production of documents "associated with any mental disability, and [Ruth's] health care records associated with sexual relations." But the court did not require Ruth to sign a medical release limited to documents of this description. Rather, plaintiff's attorney was required to turn over Ruth's medical records in this category. Eventually, thousands of pages of medical records were turned over.

Red Oaks finds fault with the discovery permitted by the superior court in two respects. First, Red Oaks contends that the subject matter limitations imposed by the court were too narrow. Red Oaks points out that Ruth's cognitive abilities were at issue because of the claim that she lacked the ability to consent, and her emotional condition was at issue since emotional distress damages were sought. Red Oaks claims that all of Ruth's medical records were relevant to these issues because they might reasonably have contained, or led to, evidence concerning them. Red Oaks notes that records of physical examinations often contain observations concerning a patient's emotional state

and cognitive functions, and points to a number of medical records in this case that contained such observations.

Second, Red Oaks contends that it was entitled to a signed medical release so that Red Oaks could collect medical records directly from Ruth's healthcare providers rather than having to depend on plaintiff's counsel to produce them.

 We agree with Red Oaks's first point. The filing of a personal injury action waives the physician/patient privilege as to all information concerning the plaintiff's health and medical history relevant to the matters at issue.[53] And relevance is broadly defined for discovery purposes to include not only information that would be admissible in evidence at trial, but also information reasonably calculated to lead to the discovery of admissible evidence.[54] Red Oaks's argument that all of Ruth's medical records satisfied the discovery standard of relevance, given the issues in this case, seems correct.[55]

Concerning Red Oaks's second point, we have indicated that when a plaintiff's medical privilege has been waived by the filing of suit, "discovery should normally proceed without judicial participation ... 'in a manner demonstrating candor and common sense.'"[56] Requiring a plaintiff to furnish medical releases to her adversaries is one way to accomplish that objective.[57] Further, so doing as an alternative to requiring plaintiff's counsel to produce medical records can result in the discovery of records of which plaintiff's counsel is not aware. It also eliminates requiring defendants to rely on plaintiff's counsel, as Red Oaks puts it, "as the gatekeeper for the production of medical records that he considered relevant."[58]

---

**52.** *See supra* parts III.A, III.F.2.

**53.** *Arctic Motor Freight, Inc. v. Stover*, 571 P.2d 1006, 1008 (Alaska 1977).

**54.** Alaska R. Civ. P. 26(b)(1).

**55.** But a reasonable limitation in terms of the time of medical treatment could have been imposed.

**56.** *Langdon v. Champion*, 745 P.2d 1371, 1373 (Alaska 1987) (quoting *Arctic Motor Freight*, 571 P.2d at 1009).

**57.** Another way is to depose, with subpoenas duces tecum, the records custodians of healthcare providers who have treated a plaintiff.

**58.** Other courts have also recognized this benefit. *See, e.g., Luciano v. Moore*, 45 Misc.2d 335, 256 N.Y.S.2d 825, 826–27 (Sup.1965) (noting defendants' contention that (a) they should not be compelled to accept plaintiff's opinion or statement that the accident aggravated her medical condition and that (b) records from her hospital stays would not shed any light upon the injuries for which she was suing, and requiring plaintiff to authorize the release of medical records dur-

■ But we do not hold that trial courts necessarily must require the furnishing of signed medical releases in personal injury litigation. There may be alternative methods of discovery that will produce the information that should be made available and at the same time better protect a plaintiff's legitimate privacy interests. Accordingly, the means and methods by which discovery may be pursued on remand should remain subject to the discretion of the superior court.

## 2. The fee and cost sharing order

On April 20, 2005, Red Oaks and Orebaugh moved to bring in Jill Friedman as a third-party defendant. The trial was then scheduled for May 9, 2005. Because the motion was made on the eve of trial and granting it would require a continuance, the court conditioned the grant of the motion by requiring that Red Oaks and Orebaugh pay fifty percent of the costs and fees incurred by the plaintiff between the date of the order and three days before the next scheduled trial. A new trial was set for April 3, 2006. But in March 2006 the trial had to be rescheduled, because of court scheduling problems, until September 11, 2006. After the trial, the court determined that $74,416 should be paid by Red Oaks and Orebaugh in accordance with the fee and cost sharing order.

Red Oaks and Orebaugh challenge this award.[59] We hold that though imposing conditions was appropriate, the award must be vacated. Only fees and costs related to adding Friedman as party should have been reimbursable. Further, in accordance with the order, fees and costs incurred after three days before the trial scheduled for April 3, 2006, should not have been awarded.

Red Oaks and Orebaugh first argue that the imposition of the conditions was an abuse of discretion because the superior court should have granted their motion to amend their answer to include a claim against Friedman when they first brought the motion in

August 2004. They argue that because the superior court should have granted their first motion, the superior court could not properly have imposed costs on them for bringing the renewed motion on the eve of trial.

The superior court's decision to later grant Red Oaks's and Orebaugh's renewed motion to amend does not imply that its earlier decision was an abuse of discretion. When Red Oaks and Orebaugh filed their renewed motion, the superior court took into consideration our intervening decision in *Miller v. Safeway, Inc.,* where we held that error had been committed in failing to allow a late amendment to a complaint.[60] Taking *Miller v. Safeway* into account, the trial court decided to grant the renewed motion conditioned as indicated.

■ We are unable to say that the court abused its discretion when in late September 2004 the court denied the initial motion to add Friedman. At that point trial was set to begin on November 1, 2004. When the ruling was made it appeared that the trial would go forward as scheduled. The trial court indicated in ruling on the motion that it was untimely because Friedman had long before been identified as a potential tortfeasor and that adding her would result in prejudice. The court appeared to accept plaintiff's counsel's argument that if Friedman were brought in as a party her counsel would need time to prepare a defense and this would result in a continuance. Further, additional discovery would be required which might include retaking depositions and deposing any expert witnesses hired by Friedman.

■ As it turned out, the November 1, 2004 trial date did not hold. Discovery was reopened on December 1, 2004, and the trial was set for May 9, 2005. It is possible that a renewed motion to add Friedman as a party made once the trial was rescheduled should have been granted without conditions. But no timely motion was made. Instead, only

ing discovery, stating that the court would settle any disputes between the parties as to whether the hospital records relate to the condition at issue and are admissible at trial).

**59.** Whether to grant a continuance or permit the late amendment of pleadings are questions left to

the discretion of the trial court reviewable by this court only for an abuse of discretion. *See Neal & Co., Inc. v. City of Dillingham,* 923 P.2d 89, 94 n. 6 (Alaska 1996).

**60.** 102 P.3d 282, 294 (Alaska 2004).

nineteen days before the scheduled May 9 trial did Red Oaks and Orebaugh move again to add Friedman to the case. The superior court observed: "It does trouble me ... that the defendants failed to seek reconsideration of this issue promptly and waited until nineteen days prior to trial, and it is for that reason that its caused in my mind a lot more unnecessary delay and additional cost." In our view these observations were appropriate and we do not believe that the superior court abused its discretion in requiring Red Oaks and Orebaugh to reimburse Ruth for fees and costs related to the addition of Friedman as a party.

But when a court imposes attorney's fees for dilatory amendments, there must be a showing of a connection between the late filing and additional expenses.[61] No such connection was required in the order under review. We agree with Red Oaks that "[i]t was unfair for the defendants to be liable during this entire time for 50% of whatever the plaintiff's attorney saw fit to do in order to better prepare their case."

We also agree with Red Oaks that attorney's fees and costs incurred after three days before the rescheduled April 2006 trial date should not have been awarded. The order by its terms is limited to this period. Further, the additional delay that occurred after the end of this period was not due to any fault of the appellees.

We therefore vacate the $74,416 award. On remand the court should award only costs and fees reasonably related to the addition of Friedman as a party, and the continuance required by her addition, incurred not later than three days before the rescheduled trial time of April 3, 2006.

## IV. CONCLUSION

For the above reasons

(1) the final judgment is AFFIRMED insofar as it dismisses Orebaugh and Parkside Assisted Living;

(2) the judgment is REVERSED with regard to the Reeveses and Red Oaks Assisted Living, Inc.;

(3) the judgment is VACATED as to the compensatory and punitive damage award in favor of the plaintiff against Gary Austin;

(4) the judgment is VACATED with respect to the $74,416 award of fees and costs against the Reeveses, Red Oaks, Orebaugh, and Parkside; and

(5) this case is REMANDED for additional proceedings in accordance with the views expressed in this opinion.

---

**61.** *Hutka v. Sisters of Providence in Wash.,* 102 P.3d 947, 959 (Alaska 2004).